St. Louis & S. F. R. Co. *v.* Foltz.

*(Circuit Court, W. D. Arkansas. Oct. 31, 1892.)*

1. MARRIED WOMAN'S SEPARATE ESTATE—CONVEYANCES.

Under the constitution and laws of Arkansas, a married woman may own real and personal property separate and apart from her husband, and she may devise, bequeath, and convey the same as if she were a *feme sole*. As to such property she is *sui juris*.

2. EMINENT DOMAIN—POWERS OF NONRESIDENT RAILROAD COMPANY.

A nonresident railroad company, which has not become domesticated under the constitution of Arkansas, cannot condemn or appropriate lands for a right of way, for depot grounds, car yards, or machine shops.

3. SAME—COMPENSATION FOR LANDS OF MARRIED WOMAN—ESTOPPEL BY ACCEPTANCE OF AWARD.

If such a railroad company acquires a right to come into the state to do business, but still remains a nonresident corporation, and it undertakes to acquire a right of way, etc., by condemnation proceedings against a married woman, who owns real estate as her separate property, and such married woman takes part in such condemnation proceedings, and accepts the award, she is estopped from recovering by a suit of ejectment the lands condemned after she has retained the money for a number of years, and still retains it, although the lands were condemned illegally.

4. SAME—ACQUIRING LANDS BY AGREEMENT.

Although a constitutional provision of a state may prohibit a nonresident railroad company from acquiring lands for the use of its road by condemnation or appropriation, still it may acquire such lands by an agreement with any citizen having a right to contract.

5. SAME—CONSTITUTIONAL PROVISION FOR CONDEMNATION.

The words "condemn or appropriate," used in the constitution of the state, mean a taking of private property under the right of eminent domain, and not by contract.

6. SAME—IMPLIED CONTRACT—ESTOPPEL BY ACQUIESCENCE.

A married woman may, under the laws of the state, make a contract with a nonresident railroad company having a right to do business in the state, by which she may convey to it a right of way for its roadbed, car yards, machine shops, etc. If she takes part in condemnation proceedings which may be illegal, and accepts the damages awarded, and retains the same for over six years, when she brings suit to recover the land, still retaining its value found by the jury in the condemnation proceedings, her conduct will be construed as amounting to an implied contract with the railroad company for a right of way, etc., out of her separate property. It will be held as an acquiescence by her, and in equity she will be estopped.

**7. SAME—ESTOPPEL OF MARRIED WOMAN AS TO HER SEPARATE PROPERTY.**
    When, under the laws of a state, the common-law disabilities of a married woman
    have been so far removed as to place her in a position where she is *sui juris* as to
    her separate property, she is subject to the law of estoppel *in pais*, and she is
    estopped by her acts and declarations, and is subject to all the presumptions which
    the law indulges against others with full capacity to act for themselves. The law
    presumes the party knew her rights. Her silence for that length of time, with
    possession and enjoyment of the money, and a failure to return it when the prop-
    erty was her separate property, makes up a state of case which creates an estop-
    pel, because it amounts to a condition which must in equity and good conscience be
    construed as a ratification of the act of the railroad company in paying her the
    money and taking possession of the property.

**8. SAME.**
    When she contracts as if unmarried she can be estopped as if sole.

**9. SAME.**
    A married woman who can under the law hold property in her own right be-
    comes *sui juris*, and she may be bound by an estoppel *in pais*, created by her
    silence.

*(Syllabus by the Court.)*

In Equity. Suit by the St. Louis & San Francisco Railroad Com-
pany against Mary A. Foltz to restrain the prosecution by her of an ac-
tion of ejectment against the railroad company. Heard upon bill and
answer and on the pleadings and exhibits in the action of ejectment as
exhibits. Decree in favor of complainant for a perpetual injunction.

Defendant set up in her complaint in the action of ejectment that she
was entitled to the immediate possession of certain lands therein de-
scribed, for the reason that plaintiff undertook, in the state circuit
court of Sebastian county, Ark., to condemn, under the laws of the
state, the said lands to be used for a roadbed and right of way for its
said railroad, as well as for car and machine shop purposes. Said suit
was removed to this court on the application of plaintiff, on the ground
that it was a nonresident corporation,—a citizen of the state of Missouri.
At the November term, 1883, on January 15, 1884, of this court,
condemnation proceedings were had in this court, and the jury assessed
the damages of plaintiff at $4,180.84. Said amount was paid into
court by plaintiff, and paid by order of the court to defendant, and ac-
cepted by her, and the judgment of the court was entered vesting the
said lands in plaintiff, to be used by it for the purposes aforesaid.
The defendant in her original and amended complaint claims that plain-
tiff has forfeited the right to the use of about 24 acres of said land, be-
cause it has not used it for the purpose for which it was condemned;
again, that the plaintiff had no right to condemn, because it was a
nonresident corporation, and it could not, under the constitution of the
state, take property by condemnation proceedings; that the right of
eminent domain cannot be exercised in favor of such a corporation;
that all the condemnation proceedings were a nullity, and that no right
or title passed to plaintiff by them. Pending the suit in ejectment,
the plaintiff filed its bill in equity, praying that defendant be restrained
from proceeding any further with her suit at bar, for the reason that her
conduct in accepting the sum of $4,180.84,—the amount awarded by
the jury in the condemnation proceedings,—and holding the same, and
not returning said sum into court, amounts to an estoppel *in pais*. Plain-
tiff, in its bill in equity, further asks that its title be quieted to said

land, and that the cloud growing out of the claim of defendant be removed. To this bill in equity defendant filed an answer. By agreement of parties the case was heard by the court upon the bill and answer, and the complaint and answer in the action of ejectment, and all exhibits in said suit were considered as exhibits in the equity case. Mrs. Foltz did not claim the right to recover the whole of the 31.07 acres, but that amount, less 7 acres, used by the railroad for its roadbed and car track.

*Tabor, Humphries & Silverman,* for plaintiff.
*B. R. Davidson,* for defendant.

PARKER, District Judge. The first question is: Did the St. Louis & San Francisco Railroad Company, at the time this property was condemned, have a right to take property by condemnation proceedings, it being a railroad corporation residing in Missouri? Section 11, art. 12, of the state constitution, provides that no foreign corporation shall "have power to condemn or appropriate property." This means that a corporation which is not a domestic one cannot use the power of eminent domain to acquire property for its uses; that a railroad company which does not become domesticated cannot use the right of eminent domain to acquire necessary real estate for its right of way, depot grounds, machine shops, etc. The St. Louis & San Francisco Railroad Company was, at the time of the condemnation proceedings, a foreign corporation, the same being chartered by the state of Missouri; but by the laws of the state of Arkansas (Sess. Acts, approved March 16, 1881, § 5) the St. Louis & San Francisco Railroad Company had a right to come into the state upon certain conditions. A part of said section 5 of said act is as follows:

"Any railroad company incorporated by or under the laws of any other state, and having a line of railroad built or partly built to or near any boundary of this state, and desiring to continue its line of railroad into or through this state, or any branch thereof, may, for the purpose of acquiring the right to build its line of railroad, lease or purchase the property, rights, privileges, lands, tenements, immunities, and franchises of any railroad company organized under the laws of this state, which said lease or purchase shall carry with it the right of eminent domain held and acquired by said company at the time of lease or sale, and thereafter hold, use, maintain, build, construct, own, and operate the said railroad so leased or purchased as fully and to the same extent as the company organized under the laws of this state might or could have done; and the rights and powers of such company, and its corporate name, may be held and used by such foreign railroad company as will best subserve its purpose, and the building of said line of railroad. * * *"

We find the facts to be that in September, 1880, a railroad company, called the Missouri, Arkansas & Southern Railroad Company, was incorporated under the laws of Arkansas for the purpose of constructing a railroad from a junction with the St. Louis, Arkansas & Texas Railroad Company, organized under the laws of the state of Arkansas, at Fayetteville, Ark., through a portion of the counties of Washington, Crawford, and Sebastian, to a junction with the Little Rock & Ft. Smith Railway

at or near Ft. Smith, in Sebastian county; that in January, 1882, said Missouri, Arkansas & Southern Railroad Company sold and conveyed to the St. Louis & San Francisco Railroad Company all its railroad, completed and uncompleted, with all its rights, privileges, franchises, and immunities belonging or in any wise appertaining to the running, operation, or maintenance of the same, together with all the depots, etc., and rolling stock and other chattels, etc., connected with and used in or about the same, and all of its real estate, etc., which it had any interest in. This the Missouri, Arkansas & Southern Railroad Company, under the law above set out, could rightfully do; and although, by such sale, the property in controversy did not pass by the conveyance to defendant of the Missouri, Arkansas & Southern Railroad Company and its rights and privileges and franchises, because such company had not yet exercised the right of eminent domain as to the property in controversy, yet the effect of such conveyance was to give the defendant a legal *status* in the state, with a full right to do business as a railroad corporation therein, although it was still a foreign corporation.

We are here brought face to face with the question whether Mrs. Foltz, a married woman, holding the property in her own right as her separate property, after she has taken part in the condemnation proceedings instituted by plaintiff, which was legally in the state to do business, but not a citizen thereof, and therefore, under the constitution, having no right to condemn property for its uses, and after she has taken the money found by the jury to be the value of the land, and keeps the same, is prevented by an estoppel *in pais* from recovering the land in controversy. To the lay mind, controlled by a sense of justice and right, it would look as though she ought not to have both money and land. She has had the use of the $4,180.84 for six years, seven months, and five days, up to the time she brought her suit; and this use, at 10 per cent., would be worth $2,758.29. It does not look hardly right that she should have this money, the interest on the same, and the land as well. Still, if the law gives it to her, it is right she should have it. The railroad company, being rightfully in the state, could make an agreement with Mrs. Foltz, or any one else, for a right of way; for although the law may prohibit a party from acquiring a right, yet, if not against public policy or immoral to do the act conferring the right, the same may be acquired by agreement with a citizen. There is nothing in the constitutional provision prohibiting a nonresident railroad company from agreeing with citizens of a state, when it is rightfully in the state to do business, for a right of way. If Mrs. Foltz could agree with the company for a right of way, could she, as a married woman, do that which amounts to an implied agreement? While under the common-law disability of coverture, I do not think she could waive the constitutional provision, which, in effect, is one in her favor. But her common-law disability of coverture has been removed by article 9, § 7, of the constitution of the state, which is that "the real and personal property of a *feme covert* in this state, acquired either before or after marriage, whether by gift, grant, inheritance, devise, or otherwise, shall, so long as she may choose, be and re-

main her separate estate and property, and may be devised, bequeathed, or conveyed by her, the same as if she was a *feme sole;* and the same shall not be subject to the debts of her husband." The act of April 28, 1873, (sections 4623–4631, Mansf. Dig.,) passed in pursuance of this constitutional provision, gives to a married woman sole and entire control over her property, and authorized her to sue and be sued alone in the courts in respect to her property. It repealed by implication so much of the act of December 14, 1844, as exempted married women from the operation of the statute of limitations. *Garland Co.* v. *Gaines,* 47 Ark. 558, 2 S. W. Rep. 460. From my examination of the law I conclude that Mrs. Foltz, under the law of this state removing the disabilities of married women, has imposed on her corresponding liabilities; that, as to the property in controversy, she is *sui juris.* I think that Herman on Estoppel and Res Judicata, at section 1105, expresses the true rule when he says:

"Under the various statutes removing the common-law disabilities from married women, corresponding liabilities have necessarily been imposed on them. They take the civil rights and privileges conferred subject to all the incidental and correlative burdens and obligations, and their rights and obligations are to be determined by the same rules of law and evidence by which the rights and obligations of the other sex are to be determined under like circumstances. To the extent and in the matter of business in which they are by law permitted to engage, they owe the same duty to those with whom they deal, and to the public, and may be bound in the same manner, as if they were unmarried. Their common-law incapacity cannot serve as a shield to protect them from the consequences of their acts when they have statutory capacity to act. A married woman is *sui juris* to the extent of the enlarged capacity to act conferred by statute, and may be estopped by her acts and declarations, and is subject to all the presumptions which the law indulges against others with full capacity to act for themselves."

The above doctrine is fully sustained by Dr. Pomeroy's Equity Jurisprudence, section 814, which says:

"Upon the question how far the doctrine of equitable estoppel by contract applies to married women, there is some conflict among the decisions. The tendency of modern authority, however, is strongly towards the enforcement of the estoppel against married women as against persons *sui juris*, with little or no limitation on account of their disability. This is plainly so in states where the legislation has freed their property from all interest or control of their husbands, and has clothed them with partial or complete capacity to deal with it as though they were single."

In *Dobbin* v. *Cordiner*, 41 Minn. 165, 42 N. W. Rep. 870, the supreme court of Minnesota said:

"Married women cannot enjoy their enlarged rights of action and of property and remain irresponsible for the ordinary legal and equitable results of their conduct. Incident to this power of married women to deal with others is the capacity to be bound and to be estopped by their conduct, when the enforcement of the principle of estoppel is necessary for the protection of those with whom they deal. * * *"

I take it that it is a true principle that Mrs. Foltz could have made a contract with the railroad company to sell them the land she held in her own right. If she could make such a contract, then she may, by her

conduct, make a contract by implication. Her conduct may amount to an equitable estoppel, and thus create in this case an implied executed contract,—executed because the railroad has the land, and she has the value thereof. If she can make an agreement, and be bound by it when executed, she may renounce any constitutional provision prohibiting the railroad company from becoming the owner of real estate by condemnation. She may waive such a constitutitional provision, as it has nothing in it prohibiting a private citizen from giving or selling lands for right of way, etc., to a nonresident railroad company. *Embury* v. *Conner*, 3 N. Y. 511, 53 Amer. Dec. 325. Principal case and notes and authorities therein cited. Mrs. Foltz, in this case, could act as though she was a *feme sole*. She was *sui juris;* and when she entered into the condemnation suit, and accepted the award made, and has kept the same, she is not in position to assail or deny the validity of the proceedings. Her action in that regard amounts to an equitable estoppel. In *Water Co.* v. *Middaugh*, 12 Colo. 434,[1] it was held that a party accepting and retaining the fund of a void judgment is estopped from assailing the judgment itself. That was a case very much like this, as it was a condemnation proceeding where the court had no right to condemn because of want of jurisdiction. It is a maxim that all are presumed to know the law. Then, in legal contemplation, Mrs. Foltz knew the illegality of this condemnation at the time it was made, and, knowing this, she accepted the value of her land as found by the jury, and kept it from the time of the condemnation to the time of bringing this suit, when she for the first time offered to repudiate the proceeding by assailing its legality. Her conduct must be taken as an acquiescence by her in the validity of the proceedings, and as creating a condition out of which springs into existence an implied contract between herself and the railroad company, which has been executed by her receiving and retaining the money and the railroad company receiving the land. In *Pryzbylowicz* v. *Railroad Co.*, 3 McCrary, 586, 17 Fed. Rep. 492, it was decided that "the owner of land which has been taken by a railroad for its right of way may by his own act estop himself from demanding actual payment of the compensation as a condition precedent to the taking for the public use. If the owner gives license, either expressed or fairly implied; if he expressly consents, or with full knowledge of the taking makes no objection, but permits a public corporation to enter upon the land and expend money, and carry into operation the purposes for which it is taken,—he may not then be permitted to eject the parties from the possession for want of payment." That was a case where there was no compensation paid. This is a case where full compensation was paid. Lord Chancellor COTTENHAM, in the case of *Duke of Leeds* v. *Earl of Amherst*, 2 Phil. Ch. 117–123, said: "If a party having a right stands by and sees another dealing with the property in a manner inconsistent with that right, and makes no objection while the act is in progress, he cannot afterwards complain."

It is claimed in this case that the railroad company has lost its right

[1] 21 Pac. Rep. 565.

to this property by nonuser for the purpose for which it was obtained. There is no evidence of the intention of the railroad company to abandon the use of the land for the purpose for which it was obtained, except its nonuser for that purpose up to this time. Under the circumstances of this case, that is not enough to show an abandonment. *Johnston* v. *Hyde,* 33 N. J. Eq. 632. At the time the railroad company obtained the property from Mrs. Foltz there was no condition that it was to be used for machine shops, etc., within a certain time. A railroad may properly provide for future requirements of a more extended traffic, and may condemn more land than it at present needs, but only what may in good faith be presumed necessary when its traffic shall be extended. Mills, Em. Dom. § 58; note, p. 352, 27 Amer. & Eng. R. Cas., (*In re Staten Island Rapid Transit R. Co.,* [N. Y. App.] 8 N. E. Rep. 548.) The acts of Mrs. Foltz are of a character to create a condition where the railroad company holds the property by an implied contract. This is equivalent to a grant by Mrs. Foltz. This property, obtained by grant, expressed or implied, is not lost by a mere nonuser for the length of time the railroad company has held the property. *Barnes* v. *Lloyd,* 112 Mass. 224. In *Eddy* v. *Chace,* 140 Mass. 471, 5 N. E. Rep. 306, the supreme court of Massachusetts said:

"Mere nonuser of an easement like the one in question, though continued for more than 20 years, will not extinguish it. The owner of an easement may abandon it, but mere nonuser does not show an abandonment. To effect this the nonuser must originate in or be accompanied by some decided and unequivocal acts of the owner inconsistent with the continued existence of the easement, and showing an intention on his part to abandon it."

There may have been a nonuser of the part of the land in controversy for the time the railroad company has had it, but that does not of itself amount to an abandonment of the land. There must be other evidence of an intention to abandon it. *Johnston* v. *Hyde,* 33 N. J. Eq. 642.

I think that the injunction should be made perpetual to restrain Mrs. Foltz from proceeding with her action of ejectment for the recovery of the lands in controversy, and it is so decreed.