UNITED STATES v. McINTOSH, and three other cases.

District Court, E. D. Virginia.
Dec. 30, 1932.

See, also (D. C.) 57 F.(2d) 573.

Paul W. Kear, U. S. Atty., of Norfolk, Va., and H. H. Rumble, Sp. Asst. to Atty. Gen., for the United States.

Edmond C. Fletcher, of Washington, D. C., and Thos. H. Lion, of Manassas, Va., for defendants.

CHESNUT, District Judge.

### Findings of Fact.

1. On May 1, 1917, the United States being at war with the Imperial German government, and being in need of land for the establishment of a Marine Corps Post, leased from Quantico Company, Inc., an area of land at Quantico, Va., composed of three tracts or parcels of land; tracts 1 and 2 covered by said lease being owned by said Quantico Company, Inc., and tract 3 being held by the Quantico Company, Inc., under lease from Hugh B. Hutchinson.

2. The United States took possession of the lands so leased and in June, 1917, established a temporary marine corps post thereon. (Report of board of January 25, 1918).

3. On January 2, 1918, the Major General Commandant appointed a board "for the purpose of making recommendations as to the land necessary at Quantico, Virginia, for quartering, instructions, target practice and maneuvering of one brigade."

4. Under date of January 25, 1918, this board submitted its report (Government Exhibit No. 1), whereby it found and reported that the entire property consisting of approximately 4,900 acres, with all improvements thereon, as designated in said report and as outlined on a blueprint attached thereto, together with certain other properties marked in yellow on said blueprint, was necessary for the quartering, instruction, target practice, and proper maneuvering of one brigade; and recommended that said property be obtained at a total cost of $575,000. The area thus recommended for acquisition by the United States included all of the land then under lease from the Quantico Company, Inc., and other lands of the Quantico Company, Inc., not under lease, and in addition thereto a tract of approximately 1,200 acres and certain lots of land belonging to Hugh B. Hutchinson, and certain lands belonging to other persons, as designated on said blueprint.

5. On July 1, 1918, the said lease from the Quantico Company, Inc., was renewed for one year from July 1, 1918, or until such time as the United States should take possession of said land with a view to purchasing or taking over the same.

6. Congress, by act approved July 1, 1918, entitled "An Act Making appropriations for the naval service for the fiscal year ending June thirtieth, nineteen hundred and nineteen, and for other purposes" (40 Stat. 704, 724 [738]) provided:

"*Marine Barracks, Quantico, Virginia:*

The President is authorized to acquire under the authority and provisions of this Act all of the land specified in the report of the board appointed by the Major General Commandant, Marine Corps, dated January twenty-fifth, nineteen hundred and eighteen, at Quantico, Virginia, as a permanent Marine Corps Post, and the sum of $475,000, or so much thereof as may be necessary, is hereby appropriated for this purpose. * * *

"The President is hereby authorized and empowered, within the amounts herein appropriated therefor, to take over immediately for the United States possession of and title to each and all of the parcels of land, including appurtenances and improvements for the acquisition of which authority is herein granted and for which appropriations are herein made: *Provided,* That if said lands * * * and improvements shall be taken over as aforesaid, the United States shall make just compensation therefor, to be determined by the President, and if the amount thereof, so determined by the President, is unsatisfactory to the person entitled to receive the same, such person shall be paid seventy-five per centum of the amount so determined by the President and shall be entitled to sue the United States to recover such further sum as added to said seventy-five per centum will make up such amount as will be just compensation therefor, in the manner provided for by section twenty-four, paragraph twenty, section one hundred and forty-five, of the Judicial Code: Provided further, That upon the taking over of said property by the President as aforesaid the title to all property so taken over shall immediately vest in the United States."

7. Under date of October 31, 1918, the Acting Secretary of the Navy wrote a letter addressed to the President, the White House, calling attention to the above act of Congress, authorizing the acquisition of additional land for Naval purposes on the Great Lakes, at Puget Sound and at Quantico, Va., in which letter the Acting Secretary of the Navy stated, among other things: "It is believed that the military necessities justify the immediate taking over in accordance with the provisions of the Act of the land required for the Naval Service at the places above mentioned * * * I am of the opinion that the immediate taking over by the United States in accordance with the provisions of the Act referred to is a vital military necessity, and I accordingly recommend that appropriate action be taken by you in accordance with the provisions of the Act referred to whereby title to the several tracts of land may become immediately vested in the United States. There is enclosed herewith a draft of a proposed proclamation that it is believed will serve the purpose. This proclamation is believed to contain an accurate description of the land desired."

8. The United States at this time and at the time of taking over the said lands was still at war with the power above named, and the taking of said lands was a military necessity.

9. On November 4, 1918, the President, pursuant to the aforesaid act of Congress, approved July 1, 1918, issued a proclamation bearing date on the 4th day of November, 1918 [40 Stat. 1874], taking over on behalf of the United States the title to all of the lands described in said proclamation, including three tracts or parcels of land described by metes and bounds, located at Quantico, Va., and needed for the permanent Marine Corps Base at Quantico, Va., and setting apart the said lands for naval purposes and bringing the same under the exclusive control of the Secretary of the Navy, who was by said proclamation authorized and directed to take immediate possession thereof in accordance with the terms of said act of Congress on behalf of the United States for the purposes aforesaid. By the said proclamation the President further authorized and directed the Secretary of the Navy to take such steps as may in his judgment be necessary for the purpose of conducting negotiations with the owners of the property, or rights therein, within the said tracts of land for the purpose of ascertaining the just compensation to which the owners thereof were entitled, in order that compensation therefor might be made in accordance with the provisions of said act. All owners of such land and improvements, and all persons having claims or liens with respect thereto, were by the said proclamation notified to appear before the board to be appointed by the Secretary of the Navy and present their claims for compensation for consideration by the said board, in accordance with the provisions of said act. All persons residing within the said tracts of land were thereby notified to vacate the same and remove therefrom all removable property within thirty days from the date of said proclamation.

11. The Secretary of the Navy, acting under authority of the President, appointed a board, hereinafter referred to as "The Board on Valuation of Commandeered Property," for the purpose of ascertaining the just compensation to which claimants of the said land and rights therein were entitled.

248

12. Among those who owned lands situate within the boundaries of the tracts of land described in the proclamation of the President on November 4, 1918, and specified in the report of said board on January 25, 1918, was Hugh B. Hutchinson, since deceased, and for whose estate Bruce McIntosh is trustee.

13. The said Board on Valuation of Commandeered Property notified the several owners of the land and property within the boundaries of said tracts of land, including the said Hugh B. Hutchinson, to appear before it and submit evidence with respect to the value of the lands or other rights claimed by them respectively.

14. The said Hugh B. Hutchinson appeared before the said Board on Valuation of Commandeered Property and submitted evidence as to the value of his said lands. The said Hugh B. Hutchinson was represented by counsel before the said board and throughout the transactions herein described.

15. All of the lands of the said Hugh B. Hutchinson involved in this suit were situated within the boundaries of the tracts of land described in the above-mentioned proclamation of the President, and all of said lands were specified in the report of the board of January 25, 1918, referred to in the aforesaid act of Congress.

16. The said Board on Valuation of Commandeered Property ascertained that just compensation to which said Hugh B. Hutchinson was entitled for his said lands including all right, title, and interest of whatsoever nature of the said Hutchinson within the area delineated by the President's proclamation of November 4, 1918, was the sum of $77,060. The findings of said board and the valuation fixed by it on said property, as aforesaid, were approved by the Secretary of the Navy.

17. The said sum of $77,060 was in this way ascertained by the President to be just compensation for said land.

18. Under date of March 6, 1919, the said Board on Valuation of Commandeered Property notified the said Hugh B. Hutchinson of the amount ascertained, as aforesaid, as just compensation for the lands and property of said Hugh B. Hutchinson, and informed him that, if the amount thereof was unsatisfactory to him, he had the right, under said act, to accept 75 per cent. thereof, and sue the United States for such additional sum as added to said 75 per cent. would make up such amount as would be just compensation for said property.

19. On the 19th day of May, 1919, the United States paid to the said Hugh B. Hutchinson, and the said Hugh B. Hutchinson accepted, the sum of $57,795, being 75 per cent. of the amount ascertained to be just compensation for his said property, and the said Hugh B. Hutchinson then and there executed and delivered to the United States a receipt under his signature and seal and duly acknowledged by him, wherein he recited that the said property hereinabove referred to was by proclamation of the President, dated November 4, 1918, taken over and title thereto in fee simple became vested in the United States on November 4, 1918; and further that the President of the United States had determined the just compensation for said property so taken over to be $77,060. By the said receipt the said Hutchinson reserved the right to sue the United States in accordance with the provision of the aforesaid act of Congress to recover such further sum as added to $57,795 will make up such amount as will be just compensation for said property.

20. Thereafter the said Hutchinson, pursuant to the provisions of said act of Congress, filed his petitions in the United States Court of Claims to recover such further sum as added to the said 75 per cent. already paid and received, would make up such sum as would amount to just compensation for his said properties. The petitions alleged that pursuant to the proclamation of the President the United States took possession of and title to the said lands of said Hutchinson, admitted the payment to him of said sum of $57,795, being 75 per cent. of the amount ascertained to be just compensation for his said property, and prayed for judgment for such additional sum as added to the sum of $57,795 already paid would make up such amount as would be just compensation for said property. In due course the court heard the said cause, and rendered a judgment therein in favor of said Hutchinson against the United States for the sum of $22,905. The said Hugh B. Hutchinson took no appeal from the said judgment, and on February 17, 1923, the United States paid to the said Hugh B. Hutchinson, and the said Hugh B. Hutchinson accepted, the said sum of $22,905 in full payment and satisfaction of the said judgment.

21. After taking over the said lands and property of said Hugh B. Hutchinson, as hereinabove set out, the United States proceeded to establish a permanent Marine Corps Base on the lands at Quantico, Va., described in the proclamation of the President, and has

expended in the work of improving and developing said Marine Corps Base approximately $4,500,000; of this sum approximately $100,000 was expended in the construction of a reservoir located on the tract of land formerly owned by said Hugh B. Hutchinson and which at the time of the taking aforesaid was under lease to the Quantico Company, Inc., and approximately $100,000 was expended on lots 8 to 13, inclusive, in block 9, being the northeast half of block 9.

22. The United States is and since November 4, 1918, has been continuously in possession of the said lands at Quantico, Va., described in the proclamation of the President, including the said lands formerly owned by said Hugh B. Hutchinson.

23. On or about the 14th day of February, 1931, Bruce McIntosh, as trustee of Hugh B. Hutchinson, deceased, the defendant in this suit, brought in the Circuit Court of the county of Prince William, Va., an action of ejectment against certain officers of the United States Marine Corps in charge of said Quantico Marine Corps Base, claiming title to and seeking to recover the same lands which were acquired by the United States from said Hugh B. Hutchinson in the manner hereinabove set out, and for which the United States paid to the said Hugh B. Hutchinson and the said Hugh B. Hutchinson accepted the sums of money hereinabove stated.

24. The state of Virginia by act of its Legislature, approved March 16, 1918 [Acts Va. 1918, c. 382] gave its consent in accordance with the Seventeenth clause, eighth section of the First article of the Constitution of the United States to the acquisition by the United States, by purchase, condemnation, lease, or in any other manner whatsoever of any land, or right or interest therein, in said state, required for sites for custom houses, court houses, post offices, arsenals, depots, terminals, cantonments, military or naval camps or bases or stations, aviation fields or stations, radio stations, storage plants, target ranges, or for other military or naval purposes whatsoever of the government, and ceded to the United States exclusive jurisdiction for all purposes in and over any lands or buildings, or right or interest which has been so acquired by the United States for any such purpose, whether before or after the passage of said act, reserving to said state the right to serve upon such sites civil and criminal process of the courts of said state.

25. There was no fraud or conspiracy or collusion, as alleged in the defendant's answer, on the part of the officers or employees of the government with respect to the method of acquisition of title by the government of the United States, or the determination of just compensation therefor. The just compensation as ultimately determined as above recited was less than the sum mentioned in negotiations between the parties prior to the passage of the act of Congress referred to, and was less than the sum which various officers of the United States, prior to the passage of the act, had stated or referred to as the probable fair value of the property or the probable cost of its acquisition. In the actual procedure of taking over the property, there is no evidence that the President personally and individually went upon and took possession of the land or determined the just compensation therefor, other than the recital in the receipt executed by the said Hugh B. Hutchinson, of which the Government's Exhibit No. 10 is a copy.

## Conclusions of Law.

1. The United States acquired title in fee simple to the lands involved in this suit on the taking over thereof by the President by proclamation of November 4, 1918.

2. Even if the United States had not so acquired title to said property, and even if there had been any irregularity in the steps taken for the acquisition of said property, yet the said Hugh B. Hutchinson, by accepting 75 per cent. of the amount of the award for said property, and by suing in the Court of Claims for such further sum, as would make just compensation for said property, and by accepting payment of the judgment rendered in said suit, consented to the taking of the said property for public use. Moreover, by the recitals contained in the receipt given by said Hutchinson under his seal for the said 75 per cent., and by waiting for approximately thirteen years until the United States had developed these lands as a part of its Marine Corps Base and had expended large sums of money thereon, the said Hugh B. Hutchinson and the said Bruce McIntosh, as trustee of his estate, are estopped to question the title of the United States to the said land.

3. The United States has exclusive jurisdiction for all purposes over the lands comprising the site of the Quantico Marine Corps Base, saving to the commonwealth of Virginia the right to serve civil and criminal process of its court therein; and the Circuit Court of Prince William county, Va., has, therefore, no territorial jurisdiction of the action of ejectment brought therein by the defendants

against certain Marine Corps officers in charge of said Base to recover the lands described in the bill.

4. The United States is entitled to a decree to quiet its title to said land, remove the cloud therefrom arising from the claim of the defendant, and perpetually enjoining the defendant, his attorney, agents, servants, and employees from prosecuting the said action of ejectment begun in the Circuit Court of Prince William county, and from claiming or in any wise asserting title to or right of possession of the said lands, or any part thereof.

### Opinion.

In the above cases the United States sues the defendants respectively to quiet title to its lands at Quantico, Va., used as a Naval Station for the Marine Corps, and to remove the cloud on its title caused by the prosecution of suits in ejectment brought by the defendants severally in the Circuit Court for Prince William county, Va., against certain officers of the government as custodians of the land, and to enjoin these ejectment suits. With some exceptions to be hereafter stated, the four cases involve substantially the same questions of law and of fact. They were tried at one time at Alexandria, but for clarity of presentation separate records have been made, and I have also made separate findings of fact and conclusions of law in each case. One opinion will suffice for all.

On a motion to dissolve the preliminary injunction a prior opinion has been rendered in the McIntosh case which set out an analysis of the bill of complaint and discussed some of the important questions arising with respect to the issuance of the injunction. The motion to dissolve was overruled. (D. C.) 57 F.(2d) 573. Brief separate opinions were also filed in the other cases, wherein there were noted the differences between them and the McIntosh case. Since then, answers have been filed in all the cases by the defendants, testimony has been taken, and the cases now stand for disposition after final hearing.

The principal questions of law for determination are: (1) Whether the United States obtained a good legal title to the lands of the defendants under the act of Congress of July 1, 1918 and the procedure thereunder taken for the acquisition of the property; (2) if there are defects in the legal title in fee simple of the United States, are the defendants estopped by their conduct in the whole matter from questioning the title of the United States to these lands; (3) do the facts alleged and proved afford a proper case for the exercise of equity jurisdiction. These questions will be discussed in their order.

1. *The Question of Title.* The act of Congress of July 1, 1918 (chapter 114, 40 Stat. 704, 724) was passed while the government of the United States was at war with Germany and Austria. It authorized the President to take over immediately title to about 5,000 acres of land at Quantico, Va., as a Naval Post for the Marine Corps; and authorized the President to determine the just compensation to be paid to the owners, to be paid immediately if satisfactory to them, otherwise 75 per cent. of the amount to be paid at once with leave to them to sue in the Court of Claims, or, if the amount was not more than $10,000, in the appropriate United States District Court. The act further provided that the title in fee simple should vest immediately and absolutely in the United States upon the taking.

The procedure in carrying out the act was as follows: Upon the recommendation of the Secretary of the Navy, the President signed a proclamation taking over title to the lands and authorizing the Secretary of the Navy to notify the owners that they must vacate within thirty days, and that they should present their claims for just compensation to a board constituted by the Secretary of the Navy to determine the amounts. The landowners were given the opportunity to present their claims in person or by counsel and submit evidence of value to this board. And the numerous claimants generally did so. The board determined the respective values, of which the landowners were notified, and the Secretary of the Navy approved the findings. With respect to the four landowners here involved, all acquiesced in the taking of their lands, and three ultimately accepted the amounts so determined by the President as just compensation in full satisfaction. In the McIntosh case the landowner accepted 75 per cent. of the amount so determined, and sued in the Court of Claims for the balance, and, after obtaining judgment therein, accepted the amount of the judgment without appeal.

The defendants now contend that, despite their acceptance of the awards as just compensation, no title passed to the United States because the act of Congress and the procedure thereunder was ineffective to transfer title from the owners to the government. Their objections are based fundamentally on the Fifth Amendment to the Constitution, which provides: "No person shall be * * * deprived of * * * property, without due process of law; nor shall private property be

taken for public use, without just compensation."

More specifically, they say: (a) That the procedure for condemnation prescribed by the act was invalid because it lacked due process of law, in that the procedure for condemnation in General Condemnation Statute of Congress (U. S. Code, title 40, §§ 257, 258 [40 USCA §§ 257, 258]) was not followed; (b) that the act did not provide for a proclamation by the President, and therefore the proclamation issued in this case was ineffective to take over the lands; (c) that the determination of just compensation is necessarily a judicial question which, by the act, was improperly delegated to the executive; (d) that the authority to the President to take the land and determine the just compensation could not be delegated by him to the Secretary of the Navy or to a board appointed by the Secretary of the Navy, even though the findings of the latter were approved by the Secretary; (e) that the moneys paid to the landowners can only be properly treated as payments on account of just compensation which they say has never been judicially determined.

These objections have been urged by counsel for the defendants in elaborate oral and written arguments, and are sought to be supported by very many judicial precedents. The questions raised are interesting and important; but after study of the authorities, I think there is no doubt that title to the land was validly acquired by the government from these landowners under the authority of the act and the procedure taken thereunder.

Similar acts for the acquisition of private property were quite common during the World War, and have been upheld in their application by the Supreme Court. See United States v. New River Collieries, 262 U. S. 341, 43 S. Ct. 565, 67 L. Ed. 1014, Phelps v. United States, 274 U. S. 341, 47 S. Ct. 611, 71 L. Ed. 1083, Seaboard Air Line R. Co. v. United States, 261 U. S. 299, 43 S. Ct. 354, 67 L. Ed. 664 (all applying the well-known Lever Act, 40 Stat. 276, 279); Manufacturers' Land, etc., v. U. S. S. B. Emergency Fleet Corporation, 264 U. S. 250, 44 S. Ct. 314, 68 L. Ed. 664 (applying the Act of March 1, 1918, c. 19, 40 Stat. 438, which authorized the Shipping Board to requisition land); Russian Volunteer Fleet v. United States, 282 U. S. 481, 51 S. Ct. 229, 75 L. Ed. 473 (applying the Act of June 15, 1917 [40 Stat. 183]); Campbell v. United States, 266 U. S. 368, 45 S. Ct. 115, 69 L. Ed. 328 (applying the Act of July 2, 1917, c. 35, 40 Stat. 241, as amended April 11, 1918, c.

51, 40 Stat. 518 (50 USCA § 171), a similar act, but in somewhat different form); United States v. Stein (D. C. N. D. Ohio) 48 F.(2d) 626 (applying the Act of May 16, 1918, 40 Stat. 550, which authorized the taking of property for housing employees in necessary war industries). See, also, Ferris v. Wilbur, Secretary of the Navy, 27 F.(2d) 262, where the Circuit Court of Appeals for this circuit impliedly approved the procedure in taking over land by the President by proclamation (40 Stat. 1820, 1827), under the same act of Congress of July 1, 1918 (Public No. 182, 65th Congress, c. 114, 40 Stat. 704, 722), with which we are concerned in these cases. See, also, for similar legislation, chapter 79 of the acts of the Sixty-Fifth Congress, 40 Stat. 345, 352, authorizing the taking of proving grounds for the War Department, and proclamation of the President issued under said act whereby lands in Harford county, Md., were taken for what is now known as Edgewood Arsenal, 40 Stat. 1731.

■ The necessity and propriety of taking private property for public use, and the extent to which it shall be taken and the procedure to be followed therein, are legislative questions, subject only to the constitutional limitation that just compensation must be made. Shoemaker v. United States, 147 U. S. 282, 298, 13 S. Ct. 361, 37 L. Ed. 170; Secombe v. Milwaukee & St. P. R. Co., 23 Wall. 108, 23 L. Ed. 67; Lewis on Eminent Domain (3d Ed.) § 255. While the state of war in this case doubtless determined the legislative policy to take the land more summarily than could have been done by following the ordinary general condemnation procedure, it is clear that the war did not suspend the operative force of the Fifth Amendment as to the determination of just compensation [United States v. L. Cohen Grocery Co., 255 U. S. 81, 88, 41 S. Ct. 298, 65 L. Ed. 516, 14 A. L. R. 1045; United States v. New River Collieries Co., 262 U. S. 341, 343, 43 S. Ct. 565, 67 L. Ed. 1014; United States v. McFarland, 15 F.(2d) 823, 826 (C. C. A. 4)], which necessarily remained a judicial question. Monongahela Navigation Co. v. United States, 148 U. S. 312, 13 S. Ct. 622, 37 L. Ed. 463; Bauman v. Ross, 167 U. S. 548, 583, 17 S. Ct. 966, 42 L. Ed. 270; Seaboard Air Line R. Co. v. United States, 261 U. S. 299, 304, 43 S. Ct. 354, 67 L. Ed. 664; United States v. New River Collieries Co., 262 U. S. 343, 43 S. Ct. 565, 67 L. Ed. 1014. The act under consideration met the constitutional requirement by providing ultimately for the judicial ascertainment of just compensation.

It is insisted by defendants' counsel that the judicial procedure to determine just compensation must be under the General Condemnation Statute (Code, title 40, §§ 257, 258 [40 USCA §§ 257, 258]), which provides that the procedure shall conform to the state practice, and it has been held by the Court of Appeals of this circuit that *where* the Legislature provides as the procedure for condemnation, a suit at common law, the right to a trial by jury is necessarily reserved to the landowner to determine what is just compensation, even though the state practice may be to the contrary. Beatty v. United States, 203 F. 620 (C. C. A. 4) where the opinion of the court was written by District Judge Smith (writ dismissed, 232 U. S. 463, 34 S. Ct. 392, 58 L. Ed. 686). But I do not construe the opinion in that case as holding that the Legislature in time of war, at least, is obliged to follow the necessarily slow condemnation procedure, if it deems, as it evidently did in this case, that the public emergency requires more expeditious action in taking over private property for public purposes, provided only that *ultimately* the determination of just compensation can be judicially established, if required by the property owner. See Russian Volunteer Fleet v. United States, 282 U. S. 481, 489, 490, 51 S. Ct. 229, 75 L. Ed. 473; Dohany v. Rogers, 281 U. S. 362, 369, 50 S. Ct. 299, 74 L. Ed. 904, 68 A. L. R. 434; Suncrest Lumber Co. v. North Carolina Park Commission, 30 F.(2d) 121, 126 (D. C.); Backus v. Fort Street Union Depot Co., 169 U. S. 557, 18 S. Ct. 445, 42 L. Ed. 853; Lewis on Eminent Domain (3d Ed.) § 511. And indeed the learned judge held the same view, as evidenced by his later opinions in the District Court of South Carolina, in the case of Filbin Corporation v. United States, 265 F. 354, and Id., 266 F. 911, where he was dealing with the procedure for ultimate determination of just compensation for property taken over under the Lever Act. The effect of these opinions in the District Court is not to throw any doubt upon the validity of the taking prior to the payment of compensation, but to impliedly read into the act the right of a landowner to have a jury trial to determine just compensation *upon suit in the District Court*, even though the act does not expressly provide for a jury trial. See, also, Louisville & N. R. Co. v. Western Union (C. C. A. 6) 249 F. 385, 402; United States v. Griffin (D. C. W. D. Va.) 14 F.(2d) 326; United States v. Chichester (D. C. W. D. Va.) 283 F. 650.

■ The objections of defendants' counsel in these cases goes not merely to the absence of express provision in the act for a jury trial, but to the whole procedure of taking the land by Presidential proclamation and the initial determination of just compensation by a board to be constituted by the Secretary of the Navy. This fundamental objection to the act cannot be sustained in view of the authoritative judicial approval that similar legislation, as above noted, has already received. With regard to the Presidential proclamation, it is contended that no provision is made therefor in the act; but this is unimportant because the President was fully authorized by the act to take over the lands without limitation as to the method to be pursued. The proclamation was a convenient and appropriate method of exercising the executive power in this respect. As already pointed out, it is not peculiar to this particular act, but was the procedure adopted under other similar acts, and was apparently approved by the Circuit Court of Appeals for this circuit in Ferris v. Wilbur, 27 F.(2d) 262.

■ It is also contended that the procedure under the act was fatally defective, in that the powers given to the president were individual and personal and could not be delegated. In my opinion this view is also unsound because the delegation of power was to the President as the Chief Executive, and not personal and individual. It is quite unreasonable to construe the act otherwise, in view of the subject-matter. And again, under similar legislation arising during the World War, judicial approval has apparently been given to delegation by the President of such authority to other members of the Cabinet, as, for instance, to the Secretary of War, Phelps v. United States, 274 U. S. 341, 47 S. Ct. 611, 71 L. Ed. 1083; Seaboard Air Line R. Co. v. United States, 261 U. S. 299, 302, 43 S. Ct. 354, 67 L. Ed. 664; to the Secretary of the Navy, Russell Motor Car Co. v. United States, 261 U. S. 514, 523, 43 S. Ct. 428, 67 L. Ed. 778; and to the Secretary of Labor, United States v. Stein (D. C.) 48 F.(2d) 626.

■ The act provided that *title* should pass immediately upon the taking. This preceded the determination and payment of just compensation. But as the taking was by the government directly (and not a taking by or for a private corporation), the constitutional requirement as to just compensation was not thereby violated. In Joslin v. Providence, 262 U. S. 668, 677, 43 S. Ct. 684, 688, 67 L. Ed. 1167, it was said by Mr. Justice Sutherland for the Supreme Court: "It has long been settled that the taking of property for public use by a state or one of its municipal-

ities need not be accompanied or preceded by payment, but that the requirement of just compensation is satisfied when the public faith and credit are pledged to a reasonably prompt ascertainment and payment, and there is adequate provision for enforcing the pledge. Sweet v. Rechel, 159 U. S. 380, 400, 404, 407, 16 S. Ct. 43, 40 L. Ed. 188; Williams v. Parker, 188 U. S. 491, 502, 503, 23 S. Ct. 440, 47 L. Ed. 559; Crozier v. Krupp, 224 U. S. 290, 306, 32 S. Ct. 488, 56 L. Ed. 771; Bragg v. Weaver, 251 U. S. 57, 62, 40 S. Ct. 62, 64 L. Ed. 135; Hays v. Port of Seattle, 251 U. S. 233, 238, 40 S. Ct. 125, 64 L. Ed. 243; Adirondack Ry. Co. v. New York, 176 U. S. 335, 349, 20 S. Ct. 460, 44 L. Ed. 492."

See, also, Cooley's Constitutional Limitations (8th Ed.) vol. 2, page 1202; 20 Corpus Juris, page 843, § 281.

In Cherokee Nation v. So. Kan. R. Co., 135 U. S. 641, 10 S. Ct. 965, 34 L. Ed. 295, and Bauman v. Ross, 167 U. S. 548, 593, 17 S. Ct. 966, 42 L. Ed. 270, where it was said that title, as distinct from right to occupy and use, did not pass until compensation was paid or secured, the court was dealing with particular statutes which expressly so provided. See, also, Suncrest Lumber Co. v. North Carolina Park Commission, 30 F.(2d) 121, 128 (D. C.); and compare Hanson Lumber Co. v. United States, 261 U. S. 581, 587, 43 S. Ct. 442, 67 L. Ed. 809, where the taking was under the General Condemnation Statute.

Defendants' counsel further contends that the act and procedure thereunder were ineffective to take title to any part of the lands in the Reid case, and to a small part of the lands in the McIntosh case, because, while included in the President's proclamation, they were not included in the report of the board referred to in the act as describing the lands to be taken. The land in the McIntosh case so said not to be included in the report of the board is trifling in amount, consisting of only about two acres out of 3,000 acres; but the value of the particular land assumes importance in the present litigation by reason of the fact that the government has erected substantial improvements thereon to the value of possibly $100,000. However, as a fact I have found that this particular disputed acreage was included in the report of the board. The question of fact depends upon certain lines or markings in the plat referred to in the board's report. The lines on the original plat had become so faded and obscured by time and handling that it was difficult, if not impossible, on a mere inspection of the plat, to determine whether the disputed area was or was not in fact included; but the testimony of the best qualified witness (Sinclair) was that that land was included. And while there was some evidence tending to the contrary, I think the weight of the evidence was in favor of the inclusion of the particular area.

But as to the Reid lands, it was admitted that they were not included in the report of the board, and therefore not expressly authorized to be acquired by the act. Nevertheless in taking over the other property it was found absolutely necessary to include the Reid lands of about 30 acres, for purposes of a sufficient water supply for the whole property. Under these conditions there would indeed have been serious doubt as to the right of the President to take the lands under the proclamation issued pursuant to the act, if the landowner had resisted the taking on that ground. The government justifies the taking not only under the particular act, but under other general war powers, and refers to the general resolution of Congress approved April 6, 1917, 40 Stat. p. 1, authorizing the President to employ the entire naval and military forces of the United States and the entire resources of the government to carry on the war. See, also, Roxford Knitting Co. v. Moore & Tierney, 265 F. 177, 179, 11 A. L. R. 1415 (C. C. A. 2); United States v. McFarland, 15 F.(2d) 823, 825 (C. C. A. 4). And the government also refers to the general "Act to authorize condemnation proceedings of lands for military purposes, approved July 2, 1917, 40 Stat. 241, as amended by the act approved April 11, 1918, 40 Stat. 518, as further amended by Act approved July 9, 1918, 40 Stat. 888 [50 USCA §§ 171, 172]."

And see Campbell v. United States, 266 U. S. 368, 45 S. Ct. 115, 69 L. Ed. 328. But the difficulty with this position, as I see it, is that the land was not taken under these more general enactments, although it could and doubtless would have been taken thereunder if the landowner had not assented to the taking under the President's proclamation (40 Stat. 1874) based on the act of July 1, 1918. However, it seems unnecessary to consider the matter further, in view of the acquiescence of the landowner in the taking under the particular proclamation.

*Estoppel.* Even if there were some legal invalidity in the act or some irregularity in the procedure thereunder for taking the property, each and all of the defendants are clearly estopped by their conduct to deny that the government has good title to the

lands. Two of the landowners, the Quantico Company, and the County School Board of Prince William county, accepted the amount of the awards as just compensation and contemporaneously gave to the government receipts and releases in which they recited in effect that the taking was valid and effective in pursuance of the act, and expressed themselves as fully satisfied with the payment made. In the case of the County School Board, the receipt and release took the form of a deed of conveyance for the land which, however, seems not to have been recorded.

In the Reid case, the owners accepted 75 per cent. of the award and gave receipt therefor, reserving the right to bring suit for the balance of just compensation. They did not bring suit within the time limited, but thereafter on January 5, 1931 (prior to the institution of the ejectment suit) voluntarily accepted the balance of the compensation previously determined.

In the McIntosh case, the landowner also accepted contemporaneously 75 per cent. of the amount of the award as determined, reserving the right to sue for the balance of just compensation, and thereafter did sue in the Court of Claims and in due course recovered a judgment for $22,905, and accepted the amount of the judgment without appeal. While the landowner in this case never executed a formal release and receipt, his petition in the Court of Claims in substance stated that the land had been taken by the United States in accordance with the act of Congress, and certainly raised no question whatsoever as to the regularity or effectiveness of the taking. It is entirely clear, therefore, that each and all of the landowners at no time objected to the power or authority of the government to take the lands, but on the contrary fully acquiesced therein and in the legal propriety of the procedure under which the land was taken. And the estoppel against them is made even more complete by their continued acquiescence and laches over a period of about 12 years, during which time the government expended approximately $4,500,000 in the improvement of the whole property. In my opinion it would be difficult to state a more complete case for the application of the law of estoppel.

[11] In the law of eminent domain, it is thoroughly well established that the property owner who has accepted compensation for his property taken in condemnation proceedings cannot thereafter question the validity or constitutionality of the act or the regularity of the procedure by which the prop-erty was taken. It was so decided many years ago in a somewhat similar case very fully considered by the Supreme Court. Great Falls Manufacturing Co. v. Garland, 124 U. S. 581, 8 S. Ct. 631, 31 L. Ed. 527. And the same law has been more recently applied in the case of Henry v. United States, 46 F. (2d) 640 (C. C. A. 3), a case presenting a situation in many respects like the present. See, also, to the same effect, St. Louis & S. F. R. Co. v. Foltz (C. C.) 52 F. 627; Robinson v. Sea View R. Co. (C. C.) 169 F. 319; Wall v. Parrot Silver & Copper Co., 244 U. S. 407, 411, 37 S. Ct. 609, 61 L. Ed. 1229.

It is contended that the defendants are not estopped by their receipts and releases under seal duly acknowledged because these are not made the basis of title set up in the bill of complaint. But I think this is entirely too narrow a view to take of the pleadings as the bills of complaint do allege the execution of the receipts and releases in three of the cases and the proceedings in the Court of Claims in the McIntosh case. Again, it is contended that the recitals in the receipts and releases are not binding on the property owners because they were incorporated in the instruments as prepared by representatives of the government, with alleged knowledge of the falsity of the recitals, and were therefore misrepresentations made to the property owners by agents of the government. But I find no fraud or misrepresentations or duress of any kind on the part of the government's representatives in any of these matters. It appears that the form of the papers while originally prepared in the Navy Department, were approved in the office of the Attorney General, and the recitals were undoubtedly prepared in good faith and correctly represented the legal aspects of the situation honestly entertained by representatives of the government, and, as I think, correctly so entertained. Beyond this there is an entire absence of evidence on behalf of the defendants to show any fraud, misrepresentation, or duress practiced upon them. None of them testified as witnesses. Furthermore, there is nothing in the evidence to suggest that any of these property owners were unwilling vendors. The contrary is fairly inferential. The only controversy was over the price, and this, as finally determined, was acquiesced in and accepted by the owners.

It is also objected that the receipts and releases were invalid because they did not contain the provision said to be required by the United States Code, title 41, § 22 (41 US CA § 22) that: "In every contract or agreement to be made or entered into, or accepted

by or on behalf of the United States, there shall be inserted an express condition that no Member of or Delegate to Congress shall be admitted to any share or part of such contract or agreement, or to any benefit to arise thereupon." But I think this contention is clearly untenable. The contracts or agreements referred to in this section seem obviously to be executory contracts, and there would be no reasonable purpose in inserting such a stipulation in the receipts given to the government for moneys paid. And, so far as I am advised, it apparently has not been the practice to insert such a condition in papers of this character.

 Defendants' counsel also contends that the landowner in the McIntosh case is not estopped by acceptance of payment of the judgment of the Court of Claims, because the amount of the judgment did not constitute just compensation, in that, although it determined the value of the land as of the time of taking, it did not include compensation by way of interest or otherwise for the period between the time of taking and full payment. In refusing to include this element of just compensation, the Court of Claims acted on the theory that interest could not be allowed on claims against the government without express statutory authority, which was not given by the act of July 1, 1918, thus apparently erroneously overlooking the consideration that in such cases the allowance of interest between the time of taking and full final payment is not the allowance of interest as such, but is simply one element of just compensation, as has been since expressly decided by the Supreme Court in Phelps v. United States, 274 U. S. 341, 344, 47 S. Ct. 611, 71 L. Ed. 1083, and Seaboard Air Line R. Co. v. United States, 261 U. S. 304, 43 S. Ct. 354, 67 L. Ed. 664. But as the owner accepted the amount of the judgment without appeal, he is now precluded from further controversy with respect to the amount claimed.

 *Equity Jurisdiction.* There remains for consideration only the final point, contended for by defendants' counsel, that equity has no jurisdiction in a case of this character. I am unable to agree with this contention. Some consideration was given to the point in the first opinion. (D. C.) 57 F.(2d) 573, 575, 576. The bills in these cases seek to remove the cloud from the plaintiff's title caused by the ejectment suits. The jurisdiction and practice in equity in such cases is well established. The requirements in such a case, apart from statute, are that the plaintiff must be in possession and must have legal title.

Frost v. Spitley, 121 U. S. 552, 556, 7 S. Ct. 1129, 30 L. Ed. 1010; Dick v. Foraker, 155 U. S. 404, 414, 15 S. Ct. 124, 39 L. Ed. 201; 4 Pom. Eq. Jur. (4th Ed.) §§ 1398, 1399; 5 Pom. Eq. Jur. (1919 Edition) §§ 2146–2154, and particularly § 2152. The fundamental requirement for equity jurisdiction is the inadequacy of the legal remedy. This peculiarity exists here, where the United States is in possession and has a legal title which is indirectly assailed by suit against the government custodians individually in a state court where the government, the real owner of the property, has not been made a party and could not so be made without its consent, which has not been given, and where the trial of such a suit, though vexatious to the real owner, could not be conclusive. The situation is a peculiar one brought about by the decision in United States v. Lee, 106 U. S. 196, 1 S. Ct. 240, 27 L. Ed. 171, holding that while the government in possession could not be sued, its custodians could be sued individually. But in that case the propriety of the remedy here invoked was definitely indicated by the court. 106 U. S. 196, 222, 1 S. Ct. 240, 27 L. Ed. 171. And similar equity procedure was approved and applied in the similar case of United States v. Stein (D. C. W. D. Ohio) 48 F.(2d) 626, supra.

In support of the jurisdiction, government counsel refer to section 6248 of the Virginia Code of 1930, which extends equity jurisdiction in case of removal of a cloud from title to conditions where the plaintiff is both out of possession and has only an equitable title with provision for jury trial in certain cases. It is doubtful whether this statute can be legally effective to expand federal equity jurisdiction to all such cases. It could hardly be properly extended to cases where the plaintiff out of possession but with legal title has adequate remedy in an ejectment suit. See Rose, Federal Jurisdiction and Procedure (4th Ed.) § 201. But further discussion of the point seems unnecessary in view of the conclusions already reached.

 There is another consideration which I think emphasizes the equity in the plaintiff's case for an injunction against the ejectment suit. In Virginia, as mostly elsewhere, the action of ejectment is a local action, and must be brought in the court having territorial jurisdiction over the land. Stowers v. Harman, 128 Va. 229, 104 S. E. 703. The General Assembly of Virginia, by act of March 16, 1918, c. 382, p. 568, ceded jurisdiction over such lands as might be acquired in the state of Virginia by the United States for

various governmental purposes, including military and naval camps or stations, reserving only the right to serve process thereon. It seems clear that the effect of this act is to transfer the territorial jurisdiction over the land involved in this case from the state to the federal courts, leaving the former without jurisdiction. Ordinarily it would be more appropriate to leave this question of jurisdiction of the state court for the decision of that court, but here the question seems to be directly raised and the conclusion necessary from the facts found; and I am fortunately relieved from any embarrassment in making the decision, as it is admitted by counsel that the Virginia courts have previously reached the same conclusion as to the effect of the Virginia act in relation to a similar act of Congress. The Virginia case referred to is Fidelity Land & Investment Corporation v. Burrage, unreported, but I am informed by counsel that the case dealt with ejectment suits against custodians of the government in possession of the Hampton Roads Naval Operating Base, acquired by the government under the act of June 15, 1917, (Public No. 23, 65th Congress, 40 Stat. 207). There, as here, ejectment suits were brought in the local Virginia court which, however, resulted in dismissal for lack of jurisdiction by reason of the Virginia act of March 16, 1918, above mentioned. And I am further advised by counsel that the Supreme Court of Appeals of Virginia refused writs of error in the case, and the plaintiffs have now brought similar actions of ejectment in the United States District Court for the Eastern District of Virginia. Accordingly, it seems clear that the Circuit Court of Prince William county does not have territorial jurisdiction over these actions of ejectment. See Ft. Leavenworth R. R. Co. v. Lowe, 114 U. S. 525, 5 S. Ct. 995, 29 L. Ed. 264; Arlington Hotel Co. v. Fant, 278 U. S. 439, 49 S. Ct. 227, 73 L. Ed. 447; Steele v. Halligan (D. C.) 229 F. 1011; In re Ladd (C. C.) 74 F. 31, 41.

Counsel for the defendants has raised various objections to the constitutionality and applicability of this Virginia act to the instant case, but I think it unnecessary to discuss the objections further in view of what has already been said, and as the act has been upheld and applied in similar situations by the Virginia courts; and indeed also by the Circuit Court of Appeals for this circuit as I read the decision in Ferris v. Wilbur, 27 F. (2d) 262, 263.

In my opinion the plaintiff in all these cases is entitled to a decree quieting title to its lands at Quantico, Va., and perpetually enjoining the further prosecution of the ejectment suits. I will sign decrees to this effect when presented by counsel, with costs to be paid by the defendants, respectively.