**UNITED STATES of America**

v.

**Carol S. HOLMES.**

**Crim. No. M–75–0715.**

United States District Court, D. Maryland.

April 14, 1976.

Jervis S. Finney, U. S. Atty., and Donald H. Feige, Asst. U. S. Atty., Baltimore, Md. and Charlie P. Andrus, Captain, JAGC, Asst. Staff Judge Advocate, Aberdeen Proving Grounds, Md., for plaintiff.

D. Franklin McGinnis, Bel Air, Md., for defendant.

Francis B. Burch, Atty. Gen., State of Maryland, and Warren K. Rich, Asst. Atty. Gen., Dept. of Natural Resources, Annapolis, Md., for State of Md., amicus curiae.

JAMES R. MILLER, Jr., District Judge.

*Memorandum and Order*

■ In an information filed on October 17, 1975, the government has charged Carol S. Holmes, defendant, with violation of 18 U.S.C. § 1382 [1] in that on or about August 22, 1975, she entered Aberdeen Proving Grounds,[2] at Chillbury Point, for a purpose prohibited by a lawful regulation, that is, Aberdeen Proving Grounds Regulation 190–4 (APGR 190–4) [3] and 33 C.F.R. § 204.-30.[4]

---

1. That statute provides in pertinent part:

 "Whoever, within the jurisdiction of the United States, goes upon any military . . reservation, post, fort, arsenal, yard, station, or installation, for any purpose prohibited by law or lawful regulation . . . " shall be punished.

2. It is stipulated that Aberdeen Proving Grounds is a testing and research and development installation of the United States Army and has been established as a permanent military post.

3. APGR 190–4, although not published in the *Federal Register,* was adopted under Army

Reg. 380–20, and, being lawfully issued and its contents being capable of being accurately determined by resort to sources whose accuracy cannot reasonably be questioned, is entitled to be judicially noticed by this court. Rule 201(b)(2), *Fed.Rules of Evid.; N. L. R. B. v. E. C. Atkins & Co.,* 331 U.S. 398, 67 S.Ct. 1265, 91 L.Ed. 1563 (1947). The version in force in August, 1975, designated certain areas of Aberdeen Proving Grounds, including the land areas in the vicinity of Chillbury Point, as "Controlled Areas," entry into which via air or water is prohibited by the regulation. It also

---

4. Note 4 on p. 835.

Defendant appeared before Magistrate Paul M. Rosenberg on September 4, 1975, and requested trial in the United States District Court. She was arraigned before Magistrate Rosenberg on October 29, 1975, entered a plea of not guilty, and requested a jury trial. The defendant has filed a motion to dismiss the indictment.

It is stipulated between the parties for the purposes of the motion to dismiss that the defendant was located between the high and low water marks on the shores of the Bush River at Chillbury Point in Harford County, Maryland when she was given a citation by the Military Police.

## I

The motion to dismiss recites that it is based upon the grounds that the offense "did not occur within the jurisdiction of the United States"; that the "situs of the alleged offense was in the State of Maryland" where defendant's activity was legal; and that the "State of Maryland has retained jurisdiction of its inland waters and has not under treaty or contract ceded the same to the Federal Government by or through the acquisition of the lands occupied by the Aberdeen Proving Grounds."

The State of Maryland has filed an *amicus* brief in support of the defendant's motion to dismiss in which it argues that the public has a right to go on the Proving Grounds' subaqueous areas which lie below the mean high water mark regardless of who owns legal title to land adjacent thereto. This argument is premised on the State's position that the subaqueous areas are subject to a public trust for fishing and navigation. The State also contends that the United States has not acquired title to the subaqueous areas owned by the State prior to the establishment of the Proving Grounds. The State seems also to assert that the Federal Government does not have legislative jurisdiction under Article 1, § 8, Clause 17 of the United States Constitution, over the subject subaqueous areas as distinguished from title, possession, or ownership thereof.

The State's title argument stands on two legs: (1) that the area now constituting the Proving Grounds was not condemned in accordance with the general Federal condemnation statute, 40 U.S.C. § 257; and (2) that the State of Maryland was not made a party to, nor served with notice of, the condemnation proceeding which did occur pursuant to certain Presidential Proclamations, nor did Maryland ever receive any compensation for the subaqueous land within the perimeters of the Proving Grounds.

The argument which denies the United States legislative jurisdiction is based on the State's contention that legislative jurisdiction over the Proving Grounds, under the general cession statute in effect in 1917 (which according to the State was Chapter 357 of the 1904 *Laws Of Maryland,* codified in Article 96 § 28 of 1957 *Ann.Code of Md.*), could only vest with respect to property which the United States acquired through grant or deed from the State. Because there has been no such grant or deed from the State to the Federal Government of the subaqueous areas, the State reasons that the United States has no legislative jurisdiction over them.

prohibits entry in those "Controlled Areas" by land except at certain designated points of entry through the use of various types of passes or identification badges.

4. 33 C.F.R. 204.30, adopted pursuant to 33 U.S.C. § 3, delineates the boundaries of the restricted waters of the Aberdeen Proving Grounds, delegates to the Commanding Officer of Aberdeen Proving Grounds the authority to designate by posted bulletins or announcements the conditions under which and the times at which the public may enter the restricted waters and sets forth a schedule under which the restricted waters will "normally be open for *navigation*." (Emphasis supplied). 33 C.F.R. § 204.30(c) establishes a penalty of a fine not exceeding $500 or imprisonment of not more than six months for any person who enters said waters in violation of the regulation and without the authority of the Commanding Officer of Aberdeen Proving Grounds.

## II

■ By its express words, § 1382 applies only to instances in which the unlawful entry occurs " . . . within the jurisdiction of the United States. . . . " While this language is not entirely clear in its meaning, it probably refers to the situs of the geographical areas within which the statute applies rather than to any concept of the particular type of jurisdiction or control which the United States Government exercises over said geographical areas. Lloyd, "Unlawful Entry," 53 *Military Law Review,* 137, 141 (1971). When, as here, the term "United States" is used in a territorial sense in the federal criminal statutes, it " . . . includes all places and waters, continental or insular, subject to the jurisdiction of the United States, except the Canal Zone."[5] 18 U.S.C. § 5. Beyond doubt, lands and waters in Harford County, Maryland are geographically within the continental area subject to the jurisdiction of the United States and are, therefore, "within the jurisdiction of the United States" for the purposes of § 1382.

The "special maritime and territorial jurisdiction of the United States" is defined in 18 U.S.C. § 7(3) to include "[a]ny lands reserved or acquired for the use of the United States, and under the exclusive or concurrent jurisdiction thereof *or* any place purchased or otherwise acquired by the United States by consent of the legislature of the State in which the same shall be, for the erection of a fort . . . arsenal . . . or other needful building." (Emphasis supplied). This sentence describes two types of places or lands within the "special jurisdiction" of the United States: (1) lands reserved or acquired for the use of the United States and under its exclusive or concurrent jurisdiction and (2) lands ac-

quired by consent of the legislature within which the said lands are located. *United States v. Erdos,* 474 F.2d 157 (4th Cir. 1973).

■ Without question, the Aberdeen Proving Grounds were reserved for the use of the United States for the exercise of a legitimate and essential function of the national government, national defense. While it is true that subaqueous lands and waters are not in so many words included within the parameters of 18 U.S.C. § 7(3), it is the lesson of history that the reach of the power of federal jurisdiction will extend, unless expressly or by clear implication excluded by the Constitution or an Act of Congress, to include those matters and things reasonably necessary for the enjoyment of the sovereign powers granted the United States or for the fulfillment of the functions and duties entrusted to it. *See e. g. Greer, Commander v. Spock,* 424 U.S. 828, at 836, 96 S.Ct. 1211, at 1216–1218, 47 L. Ed.2d 505, at 512–516, 44 L.W. 4380 at 4383 (1976); *Fort Leavenworth v. Lowe,* 114 U.S. 525, 539, 5 S.Ct. 995, 1002, 29 L.Ed. 264, 269 (1885). Where, as here, the necessities of secrecy and security of a military post reasonably require that waters and subaqueous lands be restricted from access by the general public in order that the national defense function of the military post can be effectively carried out,[6] Congress, in adopting § 7(3), surely intended that the "special" jurisdiction of the United States would extend to such waters and subaqueous lands to the greatest extent allowed by the Constitution. That Congress intended for § 7(3) to include under the aforesaid circumstances waters and subaqueous lands within the "special" jurisdiction of the United States in cases in which the United States had exclusive or

---

**5.** The provisions of 18 U.S.C. § 1382 are made applicable to the Canal Zone as well by 18 U.S.C. § 14.

**6.** It is stipulated that the area described in the Presidential Proclamation, which purported to acquire the Aberdeen Proving Grounds, included the waters of the Bush River in the area here in question as well as substantial areas of the Gunpowder River and the Chesapeake Bay

adjacent to the fast land area. It is also stipulated that the described areas of the reservation, both land and water, have for years been used for the testing of weapons systems, resulting in an unknown number of rounds of unexploded shells of various types "on the uplands area of Aberdeen Proving Grounds as well as the lands under the waters of the Bush and Gunpowder Rivers and the Chesapeake Bay."

concurrent jurisdiction thereover is demonstrated by the fact that it has specifically authorized the Secretary of the Army to prescribe regulations for " . . . the use and navigation of any portion or area of the navigable waters of the United States . . . endangered or likely to be endangered by Artillery fire in target practice or otherwise, or by the proving operations . . . at any Government ordnance proving ground that may be established . . . on or near such waters. . . " 33 U.S.C. § 3.

## III

The arguments of the State and of the defendant have in large part confused and overlooked the important distinction between the acquisition by the Federal Government of title to real property through deed or through the exercise of the power of eminent domain, on the one hand, and the acquisition by it of exclusive legislative jurisdiction over real property on the other.

 The exercise of control by the Federal Government over the lands to which it has title in the former case may be termed its territorial jurisdiction, authorized by Article 4, § 3, clause 2 of the Constitution.[7] Such jurisdiction, for many purposes, may be concurrent with that of the State within the boundaries of which the lands lie, but the State's " . . . jurisdiction does not extend to any matter that is not consistent with full power in the United States to protect its lands, to control their use, and to prescribe in what manner others may acquire rights in them." *Utah*

*Power & L. Co. v. United States,* 243 U.S. 389 at 404, 37 S.Ct. 387, at 389, 61 L.Ed. 791 at 816 (1917). "[T]he inclusion within a state of lands of the United States does not take from Congress the power to control their occupancy and use, *to protect them from trespass* and injury, and to prescribe the conditions upon which others may obtain rights in them, even though this may involve the exercise in some measure of what commonly is known as the police power." (Emphasis supplied). *Id* at 405, 37 S.Ct. at 389, 61 L.Ed. at 816. *See also Alabama v. Texas,* 347 U.S. 272, 74 S.Ct. 481, 98 L.Ed. 689 (1954); *Fort Leavenworth R. R. Co. v. Lowe,* 114 U.S. 525, 539, 5 S.Ct. 995, 1002, 29 L.Ed. 264, 269 (1885); *United States v. Brown,* 384 F.Supp. 1151, 1155–1156 (E.D.Mich.1974).

 *Exclusive* legislative jurisdiction, on the other hand, may be exercised by the Federal Government over lands located within a state only with the assent of the state as provided in Article 1, § 8, Clause 17 of the Constitution[8] or by the cession by a state of part or all of its rights of sovereignty in and over certain of the lands and waters within its boundaries to the United States. *Collins v. Yosemite Park Co.,* 304 U.S. 518, 58 S.Ct. 1009, 82 L.Ed. 1502 (1938); *United States v. Unzeuta,* 281 U.S. 138, 50 S.Ct. 284, 74 L.Ed. 761 (1930); *Fort Leavenworth R. R. Co. v. Lowe, supra. Exclusive* legislative jurisdiction is not required in order for Congress to have the power under Article 4, § 3, Clause 2, the territorial jurisdiction, to regulate the use of property in which the United States has a property interest and to prevent trespasses thereon through the vehicle of 18 U.S.C. § 1382.[9]

7. That clause, known as the Property Clause, provides that "The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States."

8. That clause authorizes Congress to "exercise exclusive Legislation . . . over . . . the Seat of the Government of the United States, and to exercise like Authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings."

9. This is not to say that the sole Constitutional underpinning for § 1382 is the Property Clause, Article 4, § 3, Clause 2. Article 1, § 8, Clause 12 gives Congress the power to raise and support an Army; Article 1, § 8, Clause 14 gives Congress the power to make rules for the government and regulation of the "land Forces" and Article 1, § 8, Clause 18 gives Congress the power to make all "Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department thereof." Furthermore, where

*Utah Power & L. Co. v. United States, supra; Fort Leavenworth R. R. Co. v. Lowe, supra.*

 Just as the assent of a state is not necessary for the exercise of the Federal Government's territorial jurisdiction, neither is a state's assent necessary for the acquisition by the Federal Government of the state's lands by the exercise of the power of eminent domain. *United States v. Carmack,* 329 U.S. 230, 67 S.Ct. 252, 91 L.Ed. 209 (1946). A state may not condition the *taking* of state owned lands on state approval, unless Congress, through legislation, permits it to do so. The Federal Government, as the national government whose laws are the supreme laws of the land, may obtain good title to state property without consent of the state, as long as the applicable due process and just compensation requirements of the Fifth Amendment are met. *Id.*

In summary, while the consent of a state is necessary for the exercise of exclusive legislative jurisdiction by the Federal Government over land owned by the Federal Government within the boundaries of that state, it is not necessary for the exercise of territorial (and thereby concurrent) jurisdiction by the Federal Government over such land, particularly the determination of where, if, and under what circumstances, entry upon such land shall be allowed, nor is it necessary for the acquisition by the United States of title to land previously owned by the state.

IV

 If the United States Government has title to the subaqueous beach areas at and near Chillbury Point below the mean high water mark of the Bush River as a part of the Aberdeen Proving Grounds, then the United States has at least territorial jurisdiction which it can exercise through 18 U.S.C. § 1382, 33 C.F.R. § 204.-30, and Aberdeen Proving Grounds Regulation 190–4. *Utah Power & L. Co. v. United States, supra; Holdridge v. United States,*

282 F.2d 302 (8th Cir. 1960); *United States v. Packard,* 236 F.Supp. 585 (N.D.Calif. 1964), *aff'd* 339 F.2d 887 (9th Cir.). Similarly, in order for the United States to be able legally to prosecute the presence of the defendant upon the subaqueous area of the beach at Chillbury Point, it must not only have the right to exercise such jurisdiction over such areas, but it must also, as an element of the law of trespass, have a right of sole ownership or possession in those areas as against the defendant. *United States v. Watson,* 80 F.Supp. 649 (E.D.Va. 1948).

In *Watson,* the court held that the Federal Government had acquired title to the lands constituting the Marine Corps Reservation at Quantico, Virginia, which included a portion of Fuller Road, the only thoroughfare connecting the town of Quantico on the banks of the Potomac River with the rest of Virginia on the inland side of the Reservation. Since the town of Quantico itself had not been acquired as a part of the Reservation, the court concluded that it was *not the intention* of the United States to acquire the exclusive right to use that portion of Fuller Road within the boundaries of the Reservation, but rather that it was intended that the subject portion of Fuller Road be acquired subject to the right of ingress and egress in favor of the unacquired property in the town of Quantico. Since the exclusive right to use this "way of necessity" was excluded from the bundle of rights acquired by the Federal Government, it *a fortiori* did not have the right to exclude the defendant from Fuller Road in that case and could not therefore prosecute him for trespass under 18 U.S.C. § 1382 when he ventured upon it in his automobile in violation of the order of the Commandant of the Reservation.

V

 Since 1862, when the Maryland General Assembly enacted Chapter 129 of the *Laws of Maryland,* later codified in

consent of the state has been obtained to the acquisition of real property, Article 1, § 8,

Clause 17 is a basis for the Congressional exercise of authority in 18 U.S.C. § 1382.

Article 54, § 48 of the *Ann.Code of Md.* (1967 Repl.Vol.) the issuance of patents of ownership of submerged land in Maryland has been prohibited. The parties have advised the court that there is no evidence to suggest that the submerged land adjacent to Chillbury Point was the subject of a patent prior to 1862. Prior to its attempted acquisition by the Federal Government, therefore, title to the land below the mean high water mark of the Bush River[10] was held by the State of Maryland in trust for the usage of its citizens. *Department of Natural Resources v. Ocean City,* 274 Md. 1, 5, 332 A.2d 630 (1975); *Board of Public Works v. Larmar Corp.,* 262 Md. 24, 47–48, 277 A.2d 427 (1971); *Day v. Day,* 22 Md. 530 (1865).

The prosecution contends that the United States obtained title to the subaqueous land near Chillbury Point through its power of eminent domain exercised pursuant to Congressional authorization under the "Urgent Deficiency Act," 40 Statutes at Large 352, 353 (Oct. 6, 1917), and Presidential Proclamations numbered 1400, 40 Statutes at Large 1707, Oct. 16, 1917, and 1418, 40 Statutes at Large 1731, Dec. 14, 1917, issued under the authority of the "Urgent Deficiency Act."

▆▆▆ The stipulations made part of the record in this case (Paper 7) and the Proclamation of December 14, 1917, *supra,* of which the court takes judicial notice, establish that the subaqueous area in dispute here was within the boundaries of the land attempted to be taken by the Federal Government in 1917 to establish Aberdeen Proving Grounds. In the Proclamation of December 14, 1917, President Wilson purported to "take over for the United States the immediate possession and title, *including all easements, rights of way, riparian and other rights appurtenant thereto,* for use for the purposes specified in said act of Congress [40 Stat. 352, 353], of and to *all lands* included within the metes and bounds above described . . ." [Emphasis supplied] which metes and bounds included the area in question.

A.

▆▆▆ While it is true, as the State of Maryland has argued in its *amicus* brief, that the general condemnation procedures now codified as 40 U.S.C. § 257 were not utilized, it is within the power of Congress, consistent with the mandates of the Constitution, to provide the method through which the Federal Government is to exercise its power of eminent domain. The provisions of 40 U.S.C. § 257 are not engraved in stone; there is no reason that Congress could not adopt alternative methods of condemning property or in fact repeal 40 U.S.C. § 257 entirely and enact another law in its place. The condemnation procedures in the "Urgency Deficiency Act," enacted in 1917 subsequent to the passage of the statute now codified as 40 U.S.C. § 257, were merely alternative procedures enacted and utilized during an emergency when this country was at war with the Central Powers. *United States v. McIntosh,* 2 F.Supp. 244 (E.D.Va.1932).

▆▆▆ By the "Urgent Deficiency Act" Congress authorized the President, among other things "to take over for the United States the *immediate possession and title* of any land selected by him . . ." for a proving grounds, thus delegating to the President the power of eminent domain. The Act also provided that the United States was to ". . . make just compensation therefor . . ." and established a procedure under which the President would make an initial determination of the amount of the compensation to be paid to the respective property owners with right given to dissatisfied owners to sue the United States to recover such further sums as would be necessary to be paid to constitute just compensation. Pursuant to Proclamation 1400, the President established a commission to hear the claims of landowners for damages in order for him to reach his initial determination of the amount in each

---

**10.** This principle necessarily assumes that the Bush River is a navigable waterway. The parties stipulated to the navigability of the Bush River at oral argument.

case which would constitute "just compensation."

■■■■ Judge Chesnut, in *United States v. McIntosh, supra,* where a nearly identical procedure was involved, determined that "The act under consideration [there] met the constitutional requirement by providing ultimately for the judicial ascertainment of just compensation." (At 251). That determination applies with equal force to the "Urgent Deficiency Act." Even where the United States takes physical possession of property without any formal condemnation proceedings, there is no violation of the Fifth Amendment so long as the property owner has a remedy through suit against the United States to determine the amount of just compensation ultimately to be paid to such owner. *United States v. Dickinson,* 331 U.S. 745, 67 S.Ct. 1382, 91 L.Ed. 1789 (1947); *United States v. 422,978 Square Ft. of Land, San Francisco,* 445 F.2d 1180 (9th Cir. 1971). The "Urgent Deficiency Act" satisfied that constitutional requirement.

### B.

The State of Maryland contends today, however, that it received no notice of taking of and no compensation for the subaqueous lands of the Aberdeen Proving Grounds.[11]

■■■ Adequate notice and an opportunity to be heard on the issue of just compensation was required to be provided under the Fifth Amendment at the time Aberdeen Proving Grounds was established as well as today. *See e. g. Bragg v. Weaver,* 251 U.S. 57, 40 S.Ct. 62, 64 L.Ed. 135 (1919); *United States v. Chatham,* 323 F.2d 95 (4th Cir. 1963).

The State argues that neither the filing of the Presidential Proclamation in the Land Records of Harford County on January 31, 1920, to which a stipulation has been entered herein, nor the appearance of the Proclamation at 40 Statutes at Large 1731 constituted adequate notice to it that its subaqueous land was being condemned and that it had a right to receive compensation.

While it is true that the Presidential Proclamation did not expressly issue an invitation to the State of Maryland, as such, to come forward to file a claim for compensation, it did clearly and unequivocally assert that the United States was taking ". . . immediate possession and title, including the easements, rights of way, riparian and other rights appurtenant thereto . . . of and to all lands included within the metes and bounds . . . described . . . ." and that ". . . all owners of land . . . taken . . . and all persons having claims . . . in respect thereto . . . ." were ". . . to appear before the commission appointed by the Secretary of War . . . and present their claims for compensation for consideration by said commission and ultimate determination by the President in accordance with the provisions of the . . . Act of Congress." The metes and bounds descriptions in the relevant Presidential Proclamations clearly included within those descriptions substantial areas of the Bush and Gunpowder Rivers and the Chesapeake Bay.

The State of Maryland had actual notice of the purported acquisition by the United States of the possession of and title to the lands and waters described in the Presidential Proclamations and took certain action in reliance thereon.

For instance, an Opinion of the Attorney General of Maryland in April, 1920, stated that children living on the Proving Grounds were not entitled to attend Maryland public schools because the land had been "acquired

---

11. An assumption basic to the State's argument, of course, is that it was entitled to receive compensation for the subaqueous lands in question. That a State may obtain compensation from the Federal Government for the latter's preemptive exercise, for a purpose unrelated to navigation, of power, dominion, and control over the bed of navigable waters within the boundaries of the State is not all clear. *See United States v. 422,978 Square Ft. of Land, San Francisco,* 445 F.2d 1180, 1184–1187 (1971). For the purposes of the present case, however, the court will assume that the State of Maryland would have had a right to compensation from the United States had the State elected to enforce that right.

by the United States in 1917," had been "stricken from the tax assessment books of Harford County," and was "apparently" under the exclusive jurisdiction of the United States, and because the children living on the Proving Grounds were "living beyond [the State of Maryland's] borders." 5 Opinions of Md.Atty.Gen. 130, 131 (1920).

Additionally, it is stipulated that in 1923 [12] Albert C. Ritchie, then Governor of Maryland, received the report of the Maryland Federal War Claims Commission which had been established by the State of Maryland to hear all claims against the Federal Government arising out of World War I. This report sought to deliver to the War Department of the United States, Governor of the State of Maryland, and the Maryland delegation to Congress all the claims that existed against the Federal Government as a result of the taking over of Aberdeen Proving Grounds and/or other incidents. The report acknowledged that the Federal Government took over by Presidential Proclamation approximately 50 square miles of territory at Aberdeen, both land and water, for the use of the proving grounds, but did not assert any claim of the State of Maryland for compensation for subaqueous land. The existence of this report is conclusive evidence that the State of Maryland had actual notice of the assertion of ownership rights by the Federal Government over not only the fast land on which the proving grounds was located, but also over the subaqueous lands and waters described in the Presidential Proclamation. Simple logic as well compels the conclusion that no reason existed to include the described portions of the Bush and Gunpowder Rivers and the Chesapeake Bay within the description of the area over which "*immediate* possession and title, including all easements, rights of way, riparian and other rights appurtenant thereto," was asserted, unless it was the intention of the United States in fact to obtain immediate possession and title in and to those aqueous and subaqueous areas.

The report to Governor Ritchie, as stipulated herein, demonstrates that the State of Maryland so understood the import of the relevant proclamations of the President. It also demonstrates that the State of Maryland was aware that a procedure existed for making claims against the Federal Government for just compensation if one chose to do so.

■ In this court's view, actual notice by the State of the taking coupled with the provisions of the "Urgent Deficiency Act" published in 40 Stat. 352, 353 and the filing of the Presidential Proclamations in the Harford County Land Records in 1920 gave the State ample and adequate notice of whatever right it had to obtain compensation. It is the *opportunity* of the property owner to obtain just compensation for property acquired by the United States which is important and which is mandated by the Fifth Amendment, not the *exercise* of that opportunity by the property owner. The State of Maryland cannot now, having earlier failed to exercise its opportunity to present a claim for compensation, defeat the right of the Federal Government to title to subaqueous areas it has held and possessed for over 50 years. *United States v. 422,978 Square Ft. of Land, San Francisco, supra.*

C.

■ Even if the State still has a viable claim or right to compensation for the subaqueous lands which form a part of the Aberdeen Proving Grounds, that claim or right does not defeat the present title of the United States to those lands. The "Urgent Deficiency Act" clearly provided that title to the lands described by the President was to vest in the United States immediately ". . . upon the taking over of said property by the President. . . ." The United States has been exercising rights of possession and ownership of the subject subaqueous areas for over 50 years, bombard-

**12.** The statute of limitations with reference to suits against the United States to determine the amount of compensation due to an owner as a result of the acquisition by the United States of

possession and title to the areas described in the relevant Presidential Proclamation expired in 1924. Judicial Code of 1911, §§ 24, ¶ 20 (36 Stat. 1093) and 145 (36 Stat. 1136).

ing them with shells and other ordinance during that time. Under the enabling statute, therefore, title to the subaqueous lands, ". . . including all easements, rights of way, riparian and other rights appurtenant thereto . . ." has vested in the United States irrespective of whether any compensation has been paid therefor. The statute provided a reasonable and certain means for the judicial determination of the amount of just compensation for said lands and for its payment, but did not make the vesting of title contingent upon the determination or payment of said compensation. Such a statutory scheme is consistent with due process and the Fifth Amendment. *Sweet v. Rechel,* 159 U.S. 380, 16 S.Ct. 43, 40 L.Ed. 188 (1895). The rule expressed in other cases that title to property condemned by the United States through physical seizure vests only when the owner has received compensation rests upon interpretation of the particular statutes involved in those cases, not upon Constitutional necessity. *See e. g. Sweet v. Rachel, supra; United States v. Dow,* 357 U.S. 17, 21, 78 S.Ct. 1039, 1044, 2 L.Ed.2d 1109, 1113 (1958); *Hanson Co. v. United States,* 261 U.S. 581, 587, 43 S.Ct. 442, 444, 67 L.Ed. 809, 813 (1923). *See also Joiner v. City of Dallas,* 380 F.Supp. 754, 772–774 (N.D.Tex.1974), *aff'd* 419 U.S. 1042, 95 S.Ct. 614, 42 L.Ed.2d 637 (1974); *United States v. Chatham,* 323 F.2d 95, 99–100 (4th Cir. 1963). *But see Lacy v. United States,* 216 F.2d 223, (5th Cir. 1954); *United States v. Wood,* 466 F.2d 1385 (9th Cir. 1972).

### D.

It has also been contended that the State, not having executed a deed to the Federal Government, has not been divested of its ownership of the subaqueous lands. 40 Md. Atty.Gen.Op. 148 (1955). While acknowledging that the Presidential Proclamation of December, 1917, purported, by its terms ". . . to take a considerable area below the high water mark . . ." under navigable waters at Aberdeen, the Maryland Attorney General, in his 1955 Opinion went on to state ". . . no effort has ever been made by the Federal Government to acquire title thereto." *Id.* at 149.

No further action was necessary, however, for the United States to acquire title than for Congress to pass the "Urgent Deficiency Act" with the appropriate provisions for the determination and payment of just compensation, and for the President later to issue the proclamations which were issued describing the land and asserting possession and title. As has been discussed previously, the method of condemnation of a certain parcel of land is a legislative decision of Congress on behalf of the government made supreme by Article 6 of the Constitution, and the procedure established by Congress and used in this instance was Constitutionally permitted. No deed or other approval by the State of Maryland was required for the United States to obtain title. *United States v. Carmack, supra.*

### VI

As previously noted, the relevant Presidential Proclamations contained certain metes and bounds descriptions which included the subaqueous and aqueous areas here in question, provided that the United States was acquiring title to *all* lands within said metes and bounds description, and purported to acquire likewise ". . . *all* easements, rights of way, riparian and other rights appurtenant thereto. . . ." (Emphasis supplied).

No reason exists, contrary to the situation in the *Watson* case, *supra,* to believe that it was the intention of the Federal Government to acquire anything less than *all* rights in and to the navigable waters and subaqueous lands contained within the metes and bounds description in the Proclamations. The United States already had the right to control navigation on the waters, *United States v. Kansas City Life Ins. Co.,* 339 U.S. 799, 70 S.Ct. 885, 94 L.Ed. 1277 (1950); *United States v. Chicago, M., St. P. and P. R. R.,* 312 U.S. 592, 61 S.Ct. 772, 85 L.Ed. 1064 (1941); *Lewis Blue Point Oyster Cultivation Co. v. Briggs,* 229 U.S. 82, 33 S.Ct. 679, 57 L.Ed. 1083 (1913); *United States v. Chandler-Dunbar Water Power*

*Co.,* 229 U.S. 53, 33 S.Ct. 667, 57 L.Ed. 1063 (1913). It wished obviously to have *all* rights, as the terms of the Proclamations provided, in those areas, those rights which it had already by virtue of its position as national sovereign under the Constitution as well as those rights which might have previously been possessed by others. No "ways of necessity" are here involved, as they were in the *Watson* case, to create an implied reservation to the public or to others of the absolute right to use the described waters and subaqueous lands.

Substantial reason exists, in addition to the words of the Proclamations themselves, to believe that the United States intended to obtain *all* rights in the subaqueous areas described in the Proclamations. The practical necessity of having exclusive control over maritime or amphibious approaches to an area in which highly secret as well as dangerous activities are taking place is self-evident. Particularly is this so when certain parts of those activities actually take place on the waters which constitute those maritime and amphibious approaches and when the lands beneath the waters are the resting place of untold numbers of potentiality lethal instrumentalities resulting from those activities.

This court has no trouble concluding that the United States intended to acquire the exclusive right to possess, use, and control the subaqueous areas in question.

### VII

Although not required for the exercise by the United States of its authority to exclude individuals from the subaqueous lands of Aberdeen Proving Grounds, exclusive legislative jurisdiction exists in the United States over such areas.

There was in 1917 and there is now in effect a general consent statute, giving the consent of the State of Maryland for the purpose of Article 1, § 8, Clause 17 of the United States Constitution to ". . .

the acquisition by the United States by purchase, *condemnation or otherwise* of any land in this State required for sites for . . . arsenals or other public buildings or for any other purposes of the government." [13] (Emphasis supplied).

The same legislative enactment complimented the consent by expressly granting exclusive jurisdiction to the United States as follows:

"*§ 36. Exclusive jurisdiction except as to service of process; termination of jurisdiction.*

"Exclusive jurisdiction in and over any land so acquired by the United States shall be and the same is hereby ceded to the United States for all purposes except the service upon such sites of all civil and criminal process of the courts of this State, but the jurisdiction so ceded shall continue no longer than the said United States shall own such lands."

"*§ 37. When jurisdiction vests; exemption from taxation.*

"The jurisdiction ceded shall not vest until the United States shall have acquired the title to said lands by purchase, condemnation or otherwise; and so long as the said lands shall remain the property of the United States when acquired as aforesaid, and no longer, the same shall be and continue exempt and exonerated from all State, county and municipal taxation, assessment, or other charges which may be levied or imposed under the authority of this State." [14]

These three statutes have been held by the Court of Appeals of Maryland to apply prospectively to property acquired by the United States after 1906. *Lowe v. Lowe,* 150 Md. 592, 133 A. 729 (1926); *Royer v. Bd. of Election Supervisors of Cecil Co., Md.,* 231 Md. 561, 191 A.2d 446 (1963), *cert. denied,* 375 U.S. 921, 84 S.Ct. 267, 11 L.Ed.2d 65 (1963).

Such general consent and cession statutes are ". . . not uncommon . . .

---

13. Ch. 743, § 1, *Laws of Maryland,* 1906, now codified as Article 96, § 31, *Anno.Code of Md.* (1964 Repl.Vol.).

14. Ch. 743, §§ 2 and 3, *Laws of Maryland,* 1906, now codified as Article 96, §§ 36 and 37, *Anno.Code of Md.* (1964 Repl.Vol.).

and they are as effective for purposes of Article 1, § 8, Clause 17, as consent to each particular acquisition. . . ." *United States v. Mississippi Tax Comm'n,* 412 U.S. 363, at 372, n. 15 (1973), 93 S.Ct. 2183, at 2189, 37 L.Ed.2d at 10.

Since the subaqueous lands here in question were acquired by the United States through condemnation, the State has ceded exclusive jurisdiction over them to the United States.

### VIII

For all the reasons set forth herein the motion of the defendant to dismiss shall be DENIED.