September 22, 1977

## 77–51 MEMORANDUM OPINION FOR THE ASSOCIATE DEPUTY ATTORNEY GENERAL

### Law Enforcement at San Onofre Nuclear Generation Plant

This memorandum is in response to your request that we examine the legal aspects of the U.S. Marine Corps (USMC) providing police protection for the San Onofre nuclear power plant located on the Camp Pendleton Marine Corps Reservation, San Diego County, Calif. The matter has arisen because under Nuclear Regulatory Commission (NRC) regulations, Southern California Edison (SCE), the owner of the plant, must establish documented liaison with the local law enforcement authority to insure police response as part of its plan to protect the power plant against assault.[1] The Commander of Camp Pendleton has declined to enter such an agreement with SCE on the ground that the Marine Corps' law enforcement activity is restricted to military personnel by the Uniform Code of Military Justice, 10 U.S.C. § 801 *et seq.,* and the Posse Comitatus Act, 18 U.S.C. § 1385. Civilian law enforcement, he suggested, is the responsibility of the United States Marshals Service. SCE has requested that the Attorney General clarify the respective law enforcement responsibilities of the Marine Corps and the Marshals Service.

1.  Background

Camp Pendleton was acquired by the United States in 1942 through condemnation. Jurisdiction over the land was ceded by the State of California and accepted by the Secretary of the Navy on behalf of the

---

[1] On August 6, 1977, the Special Operations Group of the U.S. Marshals Service provided security support to SCE's guard force during a demonstration at San Onofre by an antinuclear power organization. However, it had 4 days' advance notice of the demonstration, which was completely without incident. We understand that the Marshals Service requires at least 24-hour notice to assemble a Special Operations Group. We also understand that it has neither the manpower nor facilities to provide protection against a major armed assault on the plant. As NRC regulations call for such protection, *see* 10 CFR § 73.50(a)(1), the Marine Corps would be the only practical Federal alternative to a local law enforcement agency.

United States. Thus, Camp Pendleton is within the exclusive territorial jurisdiction of the United States, and the State has no power to punish crimes committed on it. *See, Johnson* v. *Yellow Cab Co.,* 321 U.S. 383, 386 (1944); *Collins* v. *Yosemite Park Co.,* 304 U.S. 518, 528–30 (1938).

The San Onofre power plant is located within the reservation on a 60-year easement granted by the Navy Department in 1964 pursuant to Pub. L. 88–82, 77 Stat. 115. The plant is located on the coast, and the site is bounded on the inland side by U.S. Highway 101. Immediately across the highway is part of Camp Pendleton. The coastline on both sides of the plant was reconveyed to the State of California for park purposes in 1972, and the United States retroceded jurisdiction over those parcels.

In 1967, when the first unit of the San Onofre plant began functioning, SCE received a letter from the Assistant Chief of Staff, G–4 of Camp Pendleton, which stated in pertinent part:

> Since civil jurisdiction at Camp Pendleton is vested in the United States Government, the matter of police protection is somewhat different here from that in civilian communities. General security within the Station is of course initially the responsibility of the Grantees who have the right to protect their personnel and property by any lawful means. Any emergency situation requiring outside police assistance should be reported to the Camp Pendleton Military Police, who will respond as soon as possible. Any criminal act committed by a member of the United States Armed Forces is under the jurisdiction of the Camp Pendleton Military Police. Most criminal acts committed by civilians would be under the jurisdiction of the Federal Bureau of Investigation. However, in most cases, and especially in emergency situations, it is advisable to contact the Military Police, who can, in turn notify the Federal Bureau of Investigation, if required, and resolve the matter of jurisdiction when the time is propitious.

In February 1977, NRC published the present version of 10 CFR 73.50, which requires, *inter alia,* documented liaison with local law enforcement authorities as a precondition to obtaining a nuclear operating license. On April 27, 1977, SCE requested from the Marine Corps a reaffirmation of its letter and a description of its response capabilities. The Staff Judge Advocate of the base responded on May 11 that the Marine Corps lacked jurisdiction over unlawful civilian activity on the reservation.

## 2.  Enforcement Authority of the Base Commander

There is no question that the San Onofre plant is within the exclusive jurisdiction of the United States, because it is within the boundaries of Camp Pendleton. The only legal issue presented is whether the military

police may apprehend civilians who violate Federal law [2] on Camp Pendleton in order to turn them over the Federal civilian law enforcement authorities for prosecution and trial.

For practical purposes, the military police constitutes the only force that provides police patrol and emergency services on a large military reservation. Arrests of civilian violators on military reservations by the military police are not uncommon.[3] While the power of military authorities to make searches that could not be made by civilian police has been often litigated,[4] civilian defendants have usually not contended that the military police lacked powers to search or arrest that civilian police would have in the same circumstances.[5]

Only *United States* v. *Banks,* 539 F. 2d 14 (9th Cir. 1976), directly addresses the question whether military authorities may arrest, on a military reservation, a civilian who has committed an offense on the reservation. In that case, the defendant was arrested by the Air Force police on an air base for possession of drugs in violation of 21 U.S.C. § 841(a). Although there was probable cause for the arrest, he contended that the Posse Comitatus Act, 18 U.S.C. § 1385,[6] completely prohibits military authorities from apprehending civilians. The Ninth Circuit rejected this argument on two grounds. First, it held that the Posse Comitatus Act "does not prohibit military personnel from acting upon base violations committed by civilians." *Id.* at 16. Second, it held that 18 U.S.C. § 1382 [7] and 10 U.S.C. § 809(a) [8] empower military authorities

<hr>

[2] NRC regulations define "industrial sabotage" to include an armed attack on a nuclear power plant, 10 CFR § 73.2(g), § 73.50(a)(1), or sabotage by an insider. *See* 18 U.S.C. §§ 2151, 2155. In addition, various California statutes could be violated, and 18 U.S.C. § 13 makes such action a Federal offense. Finally, as stated, it is a separate offense to enter a military reservation with intent to violate any law or lawful regulation, 18 U.S.C. § 1382.

[3] *See, e.g., United States* v. *Colclough,* 549 F. 2d 937 (4th Cir. 1977) (armed robbery); *United States* v. *Ellis,* 547 F. 2d 863 (5th Cir. 1977) (drugs); *United States* v. *Banks,* 539 F. 2d 14 (9th Cir. 1976) (drugs); *United States* v. *Matthews,* 431 F. Supp. 70 (D. Okl. 1976) (drugs); *United States* v. *Holmes,* 414 F. Supp. 831 (D. Md. 1976) (unlawfully entering reservation).

[4] *See, e.g., United States* v. *Ellis,* 547 F. 2d 863 (5th Cir. 1977); *United States* v. *Vaughan,* 475 F. 2d 1262 (10th Cir. 1973). Those cases turn on the question of whether upon entering the base there is an implied consent to search in the absence of probable cause.

[5] *See, e.g., United States* v. *Colclough, supra.*

[6] "Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army or the Air Force as a posse comitatus or otherwise to execute the laws shall be fined not more than $10,000 or imprisoned not more than two years, or both."

[7] "Whoever, within the jurisdiction of the United States, goes upon any military, naval, or Coast Guard reservation, post, fort, arsenal, yard, station, or installation, for any purpose prohibited by law or lawful regulation; or

"Whoever reenters or is found within any such reservation, post, fort, arsenal, yard, station, or installation, after having been removed therefrom or ordered not to reenter by any officer or any person in command or charge thereof—

"Shall be fined not more than $500 or imprisoned not more than six months, or both."

[8] "Nothing in this article limits the authority of persons authorized to apprehend offenders to secure the custody of an alleged offender until proper authority may be notified."

to make such apprehensions in order to deliver the violator to the civilian authorities. We believe that these conclusions are correct.

It is well settled that the commanding officer of a military base has the power to admit or exclude civilians "as he may prescribe in the interest of good order and military discipline." *Cafeteria Workers Union v. McElroy,* 367 U.S. 886, 892-93 (1961).[9] The Court characterized this power as "unquestioned . . . throughout our history," citing with approval a line of opinions of the Attorney General going back to 1837.

Because the commander has the power to exclude for the purpose of maintaining order, he has the implicit power to condition entry on lawful behavior. Thus, the Attorney General, in the earliest of the opinions cited by the Court in *Cafeteria Workers,* stated the authority of the Superintendent of West Point to be as follows:

> . . . I am of the opinion that the superintendent of the academy, as commandant of this military post, has a general authority to prevent any person within its limits from interrupting its discipline, or obstructing in any way the performance of the duties assigned by law to the officers and cadets. All such persons *are allowed to come within the bounds of the post, under an implied engagement on their parts to respect the military authority legally established there, and to abstain from any act which may interfere with the purposes and regulations of the post. If this engagement be violated, they must be considered as wrongdoers; and the commandant will have a right to take such measures as may be necessary to protect the interests of the establishment.* It is obvious that, when persons in civil life, who may be allowed to reside at or to resort to the post, obstruct the professors or their officers in the performance of their appropriate duties; or interfere with the studies or discipline of the academy; or encourage the cadets in acts of insubordination; or enter into correspondence with them, contrary to the regulation, their further presence at the post will become, according to the nature of the circumstances and the degree of aggravation, more or less injurious to the institution; and that in flagrant cases of this sort, the prompt removal of the offenders may be indispensable. As they will not be amenable to a court martial, there is no other way in which the ill consequences which might otherwise result from such misconduct can be prevented. *In the exercise of a sound discretion, the commandant of the post may, therefore, order from it any person not attached to it by law, whose presence is, in his judgment, injurious to the interests of the academy. And, in case any person so ordered shall refuse to depart, after reasonable notice, and within a reasonable time, having regard to the circumstances of the case, I think the superin-*

---

[9] This power of exclusion is limited to some extent by the First Amendment. *Compare, Greer* v. *Spock,* 424 U.S. 828 (1976), *with, Flower* v. *United States,* 407 U.S. 197 (1972). That limitation is not relevant here, for the law enforcement assistance that the Marine Corps is asked to furnish deals with violent, and hence unprotected, conduct.

*tendent may lawfully remove him by force.* 3 Op. Atty. Gen., at 272 (1837). [Emphasis added.]

Any violation of the civilian criminal laws on the post would appear to endanger its good order and thus justify the military authorities in apprehending the violator and excluding him.

This authority is reinforced by 18 U.S.C. § 1382, which, in part, makes it an offense to enter a military reservation "for any purpose prohibited by law or lawful regulation." Its legislative history recognized the commander's power of expulsion, but found it to be an insufficient deterrent to illegal behavior by civilians on military reservations.[10] Because the military already had the power to expel, Congress evidently anticipated that the military authorities would augment the power by apprehending civilian violators for delivery to the civil authorities. As the cases in note 3, *supra,* show, this is the normal practice.

In sum, the commander of a military reservation has a historically recognized authority to maintain order and discipline on the reservation and physically to expel disorderly civilians. In aid of that authority, Congress has made it a crime for a civilian to enter a military reservation with intent to violate the law. If the commander can expel, for the benefit of the installation, civilians who violate the law, it follows that he may turn them over to civilian law enforcement authorities and that they may be apprehended for that purpose.

Emergency response by the military police to actual or attempted sabotage of the nuclear power plant would, we believe, be for the purpose of maintaining order on the reservation. In the light of the SCE security forces and physical safeguards required by NRC, any industrial sabotage would probably require violent action. Protection of civilian property lawfully within the bounds of the reservation from attack and suppression of violent crime serve to maintain order within the whole of Camp Pendleton. Moreover, any act of industrial sabotage at the plant would create a risk of nuclear accident and release of radiation threatening the safety and well-being of the entire base. It is plainly within the commander's authority to maintain order to provide the emergency military police assistance on the reservation necessary to prevent such an incident.[11]

The Posse Comitatus Act is not to the contrary.[12] It is well known that the Posse Comitatus Act was enacted during the Reconstruction era to prohibit use of Federal troops to support the enforcement of

---

[10] *See* Act of March 4, 1909, § 45, 35 Stat. 1097; S. Rep. 10, 60th Cong., 1st Sess., at 16.

[11] This is particularly true because there is no other police patrol agency with Federal jurisdiction on Camp Pendleton.

[12] On its face, the Posse Comitatus Act applies only to the Army and Air Force, not to the Navy or Marine Corps. However, the Secretary of the Navy has provided by regulation that the Navy and Marine Corps shall be bound by the Posse Comitatus Act unless specifically instructed to the contrary by the Secretary. Sec. Nav. Inst. 5820.7 (May 15, 1974). This regulation has force of law. *See* 5 U.S.C. § 5031; *Ex parte Reed,* 100 U.S. 13 (1873). For practical purposes, therefore, the Marine Corps is subject to the Posse Comitatus Act unless the Secretary makes an exception.

State or Federal laws in the civilian community. *See, generally, Chandler* v. *United States,* 171 F. 2d 921, 936 (1st Cir. 1948); *Gillars* v. *United States,* 182 F. 2d 962 (D.C. Cir. 1950); *United States* v. *Red Feather,* 392 F. Supp. 916, 920-26 (D.S.D. 1975); 16 Op. Atty. Gen. 162–164 (1878); 7 Cong. Rec. 3579-86, 3846-49, 45th Cong., 2d Sess. (1878). The Act, accordingly, has been held not to forbid the use of the military to enforce the law against civilians in territories under military control where the Armed Forces are lawfully responsible for the maintenance of order. *Gillars* v. *United States, supra,* at 973. This principle should apply equally to a military reservation. Moreover, limiting the effect of the Posse Comitatus Act to the civilian community avoids any inconsistency between it and the subsequently enacted 18 U.S.C. § 1382. We therefore conclude that the Posse Comitatus Act does not restrict the use of military police on a military reservation to maintain order by apprehending civilians who commit crimes on the reservation.

MARY C. LAWTON
*Deputy Assistant Attorney General*
*Office of Legal Counsel*
